**Richard RUBIN and Helene Rubin,
Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 277, Docket 33516.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 10, 1970.

Decided June 30, 1970.

Martin D. Ginsburg, New York City (Weil, Gotshal & Manges, Martin B. Amdur and Lawrence R. Dittelman, New York City, of counsel), for petitioners-appellants.

Stuart A. Smith, Atty., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, and Harry Baum, Attys., Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY, Circuit Judge.*

FRIENDLY, Circuit Judge:

■ The Tax Court here sustained, 51 T.C. 251, a finding by the Commissioner of deficiencies in the reported income of Richard Rubin (sometimes hereafter "the taxpayer" or "the petitioner") for 1960 and 1961. The deficiencies resulted from concluding that amounts paid by Dorman Mills, Inc. for management services, rendered by Rubin, to Park International, Inc., a corporation in which he was the controlling stockholder, less related expenses of Park, constituted income of Rubin under § 61 of the Internal Revenue Code of 1954. In light of that conclusion the Tax Court did not reach the Commissioner's alternative argument under § 482, Allocation of Income and Deductions among Taxpayers. We hold the Tax Court's ruling to be erroneous,. and reverse and remand for consideration of the issue under § 482.

The facts are set forth in detail in the Tax Court's opinion, and we shall state only the essentials: During the late 1950's Richard Rubin was an officer of Rubin Bros., a firm founded many years before by his father and two uncles and engaged in the purchase, processing, and resale of wool, orlon, and nylon waste and in related businesses. Dorman Mills, Inc., a West Virginia corporation manufacturing textile fabrics, had long been a valued customer. Its operations became unprofitable and by 1956 it owed Rubin Bros. some $60,-000 or $70,000.

---

* Circuit Judge Feinberg, a member of the panel that heard argument, later recused himself, and the appeal is being decided by the two other judges as provided in § 0.14(b) of the rules of this court.

After other endeavors unnecessary to detail, Richard developed a satisfactory plan to keep Dorman Mills afloat. He and his two brothers, William and Larry, formed Park International, Inc. (Park). Richard took 70% of the stock, which he continued to hold at all times relevant to this appeal; the remaining 30% was held equally by the two brothers.[1] The stock was issued for a nominal consideration but William and Larry each made a $10,000 loan to the corporation. Park then entered into a contract with Dorman Mills, Inc., and its principal stockholder, Franklin Dorman. This provided that Park would lend Dorman Mills the $20,000 it had received from William and Larry, this to be subordinated to additional financing of not to exceed $150,000 which Dorman Mills, Inc. would seek to obtain, and would furnish management services in return for 25% of the annual net profits of Dorman Mills, Inc. in excess of $25,000. In a simultaneous agreement, Richard was granted a four-year option on Franklin Dorman's controlling block of stock and obtained the right to vote it.[2] Although the contracts did not explicitly say so, all parties understood that Richard would perform the management services Park was obliged to furnish.

As a result of Richard's efforts and the additional financing, Dorman Mills stopped its long downhill slide, and in the last quarter of 1958 it began to show a profit. In 1959, it made the initial payments under the management services contract and repaid the $20,000 loan. With this money Park began to purchase modern paintings for appreciation and resale, building up to an inventory of nearly $150,000 by mid-1966. The art business was handled by William and, until 1962, Larry, both experts in the field. Richard continued to run Dorman Mills under the management services contract and its extensions and revisions until 1963, when the contract was cancelled in connection with the takeover of Dorman Mills by United Merchants & Manufacturers, Inc., a large publicly-held corporation. Park apparently has never paid a dividend, but it did pay salaries to all three brothers from mid-1959 to mid-1962, and to Richard and William thereafter.

The Commissioner asserted deficiencies against Richard Rubin for the years 1960 and 1961, on the theory that Park's receipts under the Dorman Mills contract, less related expenses, constituted income to him. After the amounts of the deficiencies had been corrected by stipulation to $5,872 for 1960 and $25,304 for 1961, the Tax Court sustained the Commissioner. This appeal followed.

"Loaned employee" cases such as this reveal a tension between competing policies of the tax law. On one side is the principle of a graduated income tax, which is undercut when individuals are permitted to split their income with others or to spread it over several years. Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). Opposing this is the policy of recognizing the corporation as a taxable entity distinct from its shareholders in all but extreme cases. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943).[3] Complicating matters are the personal holding company provisions, I.R.C. §§ 541–547, and the accumulated earnings tax provisions, I.R.C. §§ 531–537, which may or may not afford a helpful insight into the extent to which Congress wants the policy of the graduated income tax to prevail

1. In 1962 Larry sold his interest to William. In 1966 William sold his then 30% interest to Larry.

2. In 1958, Richard purchased the stock from Franklin Dorman's estate.

3. The Tax Court's attempt to distinguish an attack on the validity of Park for tax purposes, disclaimed here, from an attack on the validity of the transactions among taxpayer, Park, and Dorman Mills, is more verbal than real. In practical effect the Tax Court did disregard the existence of Park so far as the management services business was concerned. Disregard of the corporate entity requires justification, whether it is done only in some connections or, a rare case, in all.

over that of recognizing the corporate entity. The personal holding company provisions deal with the problem of the loaned employee by imposing a prohibitive tax on corporate income from personal service contracts, but only when 80% of the corporation's income is derived from such sources,[4] a condition not here fulfilled. The accumulated earnings tax is imposed when, with intent to avoid the income tax on shareholders, a corporation accumulates surplus beyond the reasonable needs of the business, another condition apparently not satisfied here. Also lurking in the background is § 482, discussed hereafter.

Confronted with this welter of doctrines and statutory provisions, the Tax Court fell back on what Professor Brown has called The Growing "Common Law" of Taxation, 34 So.Cal.L.Rev. 235 (1961), and the general provisions of § 61 of the Internal Revenue Code.[5] Specifically it relied on Lucas v. Earl, supra, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, for the rule that "income is taxed to the true earner thereof," and on the many cases holding that tax consequences depend on substance rather than form. Holding that Rubin rather than Park was the "true earner" of the Dorman Mills payments, and that "in substance" Richard had worked directly for Dorman Mills, and turned part of his salary over to Park as a contribution to capital, the court sustained the Commissioner.

We believe the Tax Court erred in its approach to the problem. Resort to "common law" doctrines of taxation and the broad sweep of § 61 may occasionally be useful in connection with "transac-tions heavily freighted with tax motives" which cannot be satisfactorily handled in other ways, see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 16–19 (2d ed. 1966), but they have no place where, as here, there is a statutory provision adequate to deal with the problem presented.[6] Section 482 of the Code allows the Commissioner to "distribute, apportion, or allocate gross income, deductions, credits or allowances" between or among "two or more organizations, trades or businesses * * * owned or controlled directly or indirectly by the same interests" if he determines that such action is "necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." See Ach v. C.I.R., 358 F.2d 342 (6 Cir.), cert. denied, 385 U.S. 899, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966); Borge v. C.I.R., 405 F.2d 673 (2 Cir. 1968).

Resort to section 482 is clearly superior to the blunt tool employed by the Tax Court. References to "substance over form" and the "true earner" of income merely restate the issue in cases like this: Who is the "true earner"? What is substance and what is form? Moreover, they do so in a way which makes it appear that these questions can be answered simply by viewing the facts with appropriate suspicion. The language of § 482 more clearly commands analysis of the facts in terms of the competing policies outlined above. Section 482 has other advantages. It provides greater flexibility than the all-or-nothing approach used by the Tax Court. It also is accompanied by relief provisions[7] to

---

4. For tax years beginning after December 31, 1963, the figure is 60%.

5. "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
   (1) Compensation for services, including fees, commissions, and similar items;
   (2) Gross income derived from business; * * *"

6. For what relevance the fact may have, it does not appear that tax motives played a significant part in the initial decision to use Park as an intermediary between Richard and Dorman Mills. Three other formats, in all of which Richard would have worked directly for Dorman Mills, were rebuffed by necessary third parties before the Park form was hit upon.

7. Rev.Proc. 65–17, 1965–1 Cum.Bull. 833, amplified by Rev.Proc. 65–31, 1965–2 Cum.Bull. 1025, and extended by Amendment I, 1966–2 Cum.Bull. 1211, permits a taxpayer to whom additional income

avoid the hardship of the result reached by the Tax Court in this case, which would require Rubin to pay taxes on money he has never received and could not now obtain without paying income taxes on the receipt. While the existence of § 482 does not preclude complete disregard of a corporate entity in the case of a loaned employee when the transaction is a sham, cf. C.I.R. v. Laughton, 113 F.2d 103, 104 (9 Cir. 1940), its availability to protect the revenue counsels against undue eagerness to make such a finding.

We are fortified in believing the Tax Court was in error by the venerable decision in Fontaine Fox, 37 B.T.A. 271 (1938), which rebuffed the attack, here accepted by the Tax Court, on a loaned employee arrangement set up by the creator of "Toonerville Trolley." [8] The Tax Court considered that decision distinguishable on two grounds: In *Fox* the taxpayer was contractually bound to render services exclusively to his controlled corporation whereas Rubin could and did render services otherwise than for the benefit of Park; also, in *Fox* the "borrowing" corporation was completely independent of the "lending" corporation, whereas Rubin held voting control of Dorman Mills during the tax years involved here. While the first asserted basis of distinction appears factually incorrect, we do not see how either basis is relevant with respect to § 61, whatever their importance under § 482 may be. If anything, the stock participation of Richard's brothers, the importance of their initial $20,000 loan, and Park's conduct of an art business which the brothers managed make the case *a fortiori* to *Fox*. Cf. the "family partnership" decisions, C.I.R. v. Tower, 327 U.S. 280, 287, 66 S.Ct. 532, 90 L.Ed. 670 (1946); C.I.R. v. Culbertson, 337 U.S. 733, 754, 69 S.Ct. 1210, 93 L.Ed.

1659 (1949) (concurring opinion of Mr. Justice Frankfurter).

In remanding the case to the Tax Court for consideration of the substantive and procedural issues surrounding the Commissioner's claim under § 482, we do not intimate any view on what the result should be.

Reversed and remanded.

is allocated under § 482, here Richard, to receive funds from the taxpayer from whom the income was taken, here Park, without the imposition of a further tax upon the receipt. The parties have stipulated that if the instant case should be determined against the taxpayer under § 482, these procedures shall apply.

8. Apparently the Commissioner there did not contend that the predecessor of § 482 should be applied.