SILVANO ACHIRO AND CAROL ACHIRO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PETER ROSSI AND GEMMA ROSSI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 467–79, 468–79.     Filed October 19, 1981.

*Alvin R. Wohl* and *Michael P. Casterton,* for the petitioners.
*Woodford G. Rowland,* for the respondent.

HALL, *Judge*: Respondent determined deficiencies in petitioners' income taxes as follows:

| Petitioners | Year | Deficiency |
|---|---|---|
| Silvano and Carol Achiro | | |
| Docket No. 467–79 ............... | 1975 | $13,414 |
| | 1976 | 19,979 |
| Peter and Gemma Rossi | | |
| Docket No. 468–79 ............... | 1975 | 13,417 |
| | 1976 | 20,061 |

The issues for decision are:

(1) Whether respondent properly allocated all of the income and deductions of A & R to Tahoe City Disposal and Kings Beach Disposal under:

(a) Section 482;[1]

(b) Section 269; or

(c) Section 61 (sham corporation theory or assignment of income doctrine);

(2) In the alternative, whether amounts paid by Tahoe City Disposal and Kings Beach Disposal to A & R and designated as

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless indicated otherwise.

management fees were expended for the purpose designated and were ordinary and necessary business expenses;

(3) Whether the employees of Tahoe City Disposal should be aggregated pursuant to section 414(b) with the employees of A & R for purposes of applying the antidiscrimination provisions of section 401 to A & R's pension and profit-sharing plans.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

All the petitioners resided in Tahoe City, Calif., at the time they filed their petitions in these cases.[2]

Petitioner Silvano Achiro (Achiro) became involved in the scavenger business in 1954 as a truck driver in San Francisco, Calif. In 1964, Achiro moved to Lake Tahoe where he and his uncle formed Tahoe City Disposal Co. Petitioner Peter Rossi (Rossi) became associated with Tahoe City Disposal in 1970. During all times relevant to this case, Achiro served as president and Rossi served as vice president of Tahoe City Disposal, and each owned one-half of its capital stock. Tahoe City Disposal has, since its incorporation, been engaged in the waste collection business in Tahoe City, Calif., and it has always been qualified as a subchapter S corporation.

On May 9, 1972, Tahoe City Disposal executed an agreement with Placer County to manage a landfill operation; this landfill operation was treated as a division of Tahoe City Disposal under the name North Tahoe Sanitary Landfill. Petitioners controlled and managed all aspects of Tahoe City Disposal's business during all relevant times.

In late 1973, Hubert Knoll asked petitioners whether they were interested in acquiring an interest in his scavenger company in Kings Beach, Calif. At that time, Knoll and his daughter Jill Shaffer owned the entire business. On or about October 1, 1973, each petitioner acquired a 25-percent interest in Knoll's business, and Bud Shaffer (Shaffer), Knoll's son-in-law, acquired the remaining 50-percent interest. Petitioners and Shaffer operated this business as a partnership from

---

[2]Carol Achiro and Gemma Rossi are petitioners solely by virtue of having filed joint returns with their respective husbands. Hereafter, "petitioners" refers to Silvano Achiro and Peter Rossi.

October 1, 1973, until its incorporation as Kings Beach Disposal Co. on December 12, 1973. The following chart shows Kings Beach Disposal's officers and shareholders during all times pertinent to this case:

| Shareholder/officer | Corporate office | Percentage ownership of capital stock |
|---|---|---|
| Shaffer | President | 50% |
| Achiro | Vice president | 25% |
| Rossi | Treasurer | 25% |
| Jill Shaffer | Secretary | 0 |
| | | 100% |

Kings Beach Disposal, since its incorporation, has been engaged in the waste collection business in Kings Beach, Calif., and has been taxed as a regular corporation.[3]

Shaffer did not want to be involved in the management of Kings Beach Disposal. Accordingly, petitioners bore the burden of managing Kings Beach Disposal from its inception.

Both petitioners received monthly salaries from Tahoe City Disposal and Kings Beach Disposal for their services as officers and employees. Petitioners' salaries from these companies continued until March 31, 1975, after which time they received no direct salaries or compensation from them.

The following chart shows the number of employees, exclusive of petitioners, of Tahoe City Disposal and Kings Beach Disposal on the dates indicated:

| | Tahoe City Disposal | Kings Beach Disposal |
|---|---|---|
| Dec. 31, 1975 | 9 | 3 |
| Dec. 31, 1976 | 10 | 4 |
| Dec. 31, 1977 | 11 | 4 |

On November 14, 1974, Achiro, Rossi, Carol Achiro, and Renato Achiro, in their capacities as incorporators and first directors, formed A & R Enterprises, Inc. (A & R). The following chart shows A & R's officers and shareholders during all times pertinent to this case:

---

[3]Kings Beach Disposal is not a party to this proceeding but has agreed to be bound by the decision of the Court.

| Shareholder/officer | Corporate office | Percentage ownership of capital stock |
|---|---|---|
| Achiro .............. | President | 24% |
| Carol Achiro ..... | Vice president | 0 |
| Rossi ............... | Secretary-Treasurer | 24% |
| Renato Achiro ...................................... | | 52% |
| | | 100% |

Petitioners contributed A & R's initial $500 capitalization.

Renato Achiro (Renato) is Silvano Achiro's brother and Peter Rossi's brother-in-law. Renato became a 52-percent shareholder of A & R at his brother's suggestion. Silvano Achiro contributed that portion of A & R's initial capital attributable to Renato's stock. At the time Renato acquired his interest in A & R, he was not looking for this type of investment in the Lake Tahoe area. Renato received no dividends from A & R in 1975 or 1976, and the stock had no value to him in those years. He knew he owned a controlling interest in A & R, but never exercised control. Renato offered business advice to petitioners both before and after the formation of A & R, but never received any compensation for such advice. Renato has never made any suggestions to A & R that would result in his earning any income from his A & R stock. Renato recognized that he would not make any money from his A & R stock unless he moved to Lake Tahoe and became actively involved in the business. Renato has never been actively involved in A & R's business as a shareholder, officer, or employee.

As set out in its articles of incorporation, one of A & R's express purposes is to provide management, consulting, and advisory services. On November 14, 1974, in furtherance of this purpose, A & R entered into agreements for management services with Tahoe City Disposal and Kings Beach Disposal. During the 20-year terms[4] of these management services contracts, A & R agreed to manage all facets of the disposal companies' operations.[5] In exchange for these management

---

[4] These contracts were subject to termination on 90 days' written notice by either party, with or without cause.

[5] Among other things, A & R agreed to be responsible for the following areas of the disposal companies' businesses: accounting; clerical; administrative; research; purchasing; marketing; development; financing; cash management; insurance; selection of independent accountants and outside counsel; tax return preparation; hiring, firing, and supervision of

services, each disposal company agreed to pay A & R a management fee and to reimburse A & R for all direct costs and expenses incurred in the performance of the contracted services. The disposal companies paid all management fees required by these contracts (including subsequent increases) during the years in issue. The management fees paid by Tahoe City Disposal to A & R were expended for the purpose designated and were reasonable in amount.

In addition, on November 14, 1974, A & R also executed employment contracts with petitioners. Each employment contract was for a 5-year term. Pursuant to these contracts, A & R employed Achiro as its president and general manager and Rossi as its treasurer and management consultant. Each petitioner agreed to devote his full time and energy to the performance of his duties under his contract. In addition, each petitioner agreed not to render services of a business or commercial nature to any other person or firm and not to engage in any activities competitive with or adverse to A & R's business or welfare. In exchange for petitioners' services, A & R agreed to pay each petitioner a salary plus an annual bonus and, in addition, to provide a death benefit plan and a wage continuation plan. Petitioners received their first salary payments from A & R in March 1975, covering the period from December 1974 through March 1975. All subsequent salary payments required under these employment contracts have been made. Petitioners have been the only employees of A & R since its incorporation.

A & R's books and records consisted of a bank statement, a checkbook, and a bankbook. In addition, A & R's accountants kept a record of receipts and disbursements, payroll records, a summary general ledger, workpapers, and tax information. A & R had no separate office, its name did not appear on any office door or building, it had no separate telephone number or listing, and it had no printed business cards bearing its name. A & R did, however, have stationery bearing its name on the letterhead.

The following chart is a summary of A & R's income and

employees; personnel and business scheduling; the negotiation, bidding, and preparation of contracts for the disposal companies' services; employee fringe benefit problems; advertising; promotion; entertainment; and any necessary additional services.

expenses for its fiscal years ending November 30, 1975, and 1976:

|  | 1975 |  | 1976 |  |
|---|---|---|---|---|
| *Income* |  |  |  |  |
| Management fees | $169,519 |  | $187,853 |  |
| Reimbursement from petitioners for personal use of firm autos | 0 | $169,519 | 1,566 | $189,419 |
| *Expenses* |  |  |  |  |
| Compensation of petitioners | 122,400 |  | 139,200 |  |
| Taxes | 1,962 |  | 2,677 |  |
| Interest | 0 |  | 29 |  |
| Depreciation | 3,674 |  | 4,611 |  |
| Pension and profit-sharing contributions | 30,600 |  | 35,500 |  |
| Other deductions | 3,847 | (162,483) | 5,626 | (187,643) |
| *Taxable income* |  | 7,036 |  | 1,776 |
| *Tax* |  | 1,114 |  | 273 |

Petitioners' scavenger businesses have grown substantially since Achiro first moved to Lake Tahoe and started Tahoe City Disposal in 1964. By the time petitioners incorporated A & R, they were devoting most of their time and efforts to managerial and supervisory functions. Petitioners functioned as employees of A & R under valid exclusive employment contracts. As employees of A & R, they rendered services to Tahoe City Disposal and Kings Beach Disposal as required by the management services contracts between A & R and the disposal companies. Petitioners' change of employment status from employees of Tahoe City Disposal and Kings Beach Disposal to employees of A & R did not alter the services rendered to Tahoe City Disposal and Kings Beach Disposal.

Effective December 1, 1974, A & R adopted the A & R Enterprises, Inc., Employees' Profit-Sharing Plan and the A & R Enterprises, Inc., Employees' Pension Plan. Petitioners were the only employees covered under A & R's plans. A & R made contributions to its plans in the following amounts:

| FYE Nov. 30— | Pension | Profit-sharing | Total | Amount applicable to each petitioner |
|---|---|---|---|---|
| 1975 | $12,240 | $18,360 | $30,600 | $15,300 |
| 1976 | 14,220 | 21,280 | 35,500 | 17,750 |

Effective January 1, 1975, Tahoe City Disposal and Kings Beach Disposal adopted the North Tahoe Solid Waste Profit-

Sharing Plan (the North Tahoe P-S Plan) for the employees of these two companies. The disposal companies made contributions to the North Tahoe P-S Plan in the following amounts:

| FYE Mar. 31[6] — | Tahoe City | Kings Beach |
|---|---|---|
| 1975 | $700 | $300 |
| 1976 | 3,100 | 900 |
| 1977 | 3,400 | 1,600 |

The following chart summarizes selected provisions of A & R's pension and profit-sharing plans and the North Tahoe P-S Plan:

| | A & R | | North Tahoe P-S plan |
|---|---|---|---|
| | Profit-sharing | Pension | |
| Eligibility | No service requirement | No service requirement | 1 year of service |
| Vesting | 100% upon participation | 100% upon participation | 10% after first year, 10% each additional year, until 100% |
| Contributions | Employer's discretion but not to exceed deductible amounts | 10% of compensation | Employer's discretion but not to exceed deductible amounts |

Petitioners' principal purpose in forming A & R and distributing 52 percent of its stock to Renato Achiro was to obtain the benefits of larger contributions to A & R's pension and profit-sharing plans of which they were the sole beneficiaries. It was understood that Renato would not vote his stock or would vote it only in accordance with Achiro's direction.

In his notice of deficiency, respondent adjusted the income of Tahoe City Disposal by disallowing as deductions the management fees paid to A & R totaling $65,000 and $170,286 for the fiscal years ending March 31, 1975, and 1976, respectively. Respondent determined that these amounts were not expended for the purpose designated or were not ordinary and necessary business expenses. Respondent further adjusted Tahoe City Disposal's income by allowing it to take all the deductions for compensation, interest, depreciation, etc., originally taken by A & R, totaling $47,316 and $133,754 for the fiscal years ending March 31, 1975, and 1976, respectively. In so doing, respondent stated: "These allocations are made to

---

[6]Tahoe City and Kings Beach both operated on fiscal years ending Mar. 31.

you [Tahoe City Disposal] from A & R Enterprises, Inc., in order to clearly reflect your income and A & R Enterprises, Inc. income."

At trial, respondent amended his answer and asserted that all of the income and deductions of A & R should be allocated to Tahoe City Disposal and Kings Beach Disposal pursuant to section 482, section 269, or section 61 (the assignment of income doctrine or the sham corporation theory). In the alternative, respondent asserted in his amended answer that the employees of Tahoe City Disposal should be aggregated with the employees of A & R pursuant to section 414(b) for purposes of applying the antidiscrimination provisions of section 401 to A & R's pension and profit-sharing plans.

## OPINION

### A. Burden of Proof

As a preliminary matter it is necessary to decide which party bears the burden of proof with respect to the various issues.

At trial, respondent requested leave to file an amended answer, which this Court granted. In that amended answer, respondent alleged for the first time that section 482, section 269, or section 61 (assignment of income doctrine or the sham corporation theory) also justified the deficiency. The amended answer also contains the alternative argument that section 414(b) requires petitioners to include in their gross incomes their aliquot portions of the contributions made by A & R to its pension and profit-sharing plans.

In response to this amended answer, petitioners filed a motion to shift burden of proof with respect to the matters pleaded therein. Generally, the burden of proof is on the taxpayer. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Rule 142(a) provides:

The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, *in respect of any new matter*, increases in deficiency, and affirmative defenses, pleaded in his answer, *it shall be upon the respondent.* * * * [Emphasis added.]

At trial, this Court agreed with petitioners that respondent's amended answer presented new matters under Rule 142(a)

and, accordingly, we shifted the burden of proof to respondent. On brief, respondent argues that the Court improperly shifted the burden of proof because his amended answer presented new theories, not new matters. He asserts that the statutory notice is sufficiently broad to encompass these theories and that petitioners knew at least as early as 5 weeks prior to trial that these theories would be relied upon by respondent and, thus, petitioners were neither surprised nor disadvantaged thereby. We are still of the view that respondent's amended answer raised new matters and that, therefore, respondent bears the burden of proof.

The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. *Estate of Jayne v. Commissioner*, 61 T.C. 744, 748–749 (1974); *McSpadden v. Commissioner*, 50 T.C. 478, 492–493 (1968); *Estate of Sharf v. Commissioner*, 38 T.C. 15, 27–28 (1962). However, if the assertion in the amended answer either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. *Estate of Falese v. Commissioner*, 58 T.C. 895, 898–899 (1972); *McSpadden v. Commissioner, supra*; *Papineau v. Commissioner*, 28 T.C. 54, 57 (1957); *Tauber v. Commissioner*, 24 T.C. 179, 185 (1955). The factual bases and rationale required to establish that the amounts paid by Tahoe City Disposal as management fees were expended for that purpose and were ordinary and necessary business expenses are entirely different from the factual bases and rationale necessary to establish that sections 482, 269, 61, and 414(b) do not apply to the present situation. *Sanderling, Inc. v. Commissioner*, 66 T.C. 743, 757–758 (1976), affd. 571 F.2d 174 (3d Cir. 1978). Respondent's new positions raised in his amended answer require the presentation of new evidence and do not simply clarify or develop his original position.

Although we believe the general rules governing the burden of proof require the transfer of that burden to respondent with regard to his determination under section 482, we feel compelled to further comment on the specific burden of proof problems under section 482. Cases dealing with the burden of proof under section 482 have set up a three-tier approach in

determining whether respondent may assert section 482, and, if so, whether respondent or petitioner bears the burden of proof thereunder.

First, if the notice of deficiency is clear that respondent is relying on section 482 in support of his deficiency, then the burden is upon the taxpayer to establish that respondent's allocation was unreasonable, arbitrary, or capricious. *Brittingham v. Commissioner*, 66 T.C. 373, 395 (1976), affd. 598 F.2d 1375 (5th Cir. 1979) (quoting *Ach v. Commissioner*, 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966)).

Second, if respondent does not indicate in the notice of deficiency that he is relying on section 482, but alerts the taxpayer of his reliance on section 482 formally in pleadings far enough in advance of trial so as not to prejudice the taxpayer or take him by surprise at trial, then the burden of proof shifts to respondent to establish all the elements necessary to support his allocation under section 482. See *Rubin v. Commissioner*, 56 T.C. 1155, 1162–1164 (1971), affd. 460 F.2d 1216 (2d Cir. 1972); Rule 142(a), Tax Court Rules of Practice and Procedure. But see *Abatti v. Commissioner*, 644 F.2d 1385 (9th Cir. 1981), revg. a Memorandum Opinion of this Court.

Third, if respondent raises section 482 at such a late date that the principles of fair play and justice would be abrogated by permitting him to rely on section 482, then he will not be allowed to rely on section 482 at all. *United States v. First Security Bank*, 334 F.2d 120, 122 n. 4 (9th Cir. 1964); *Commissioner v. Chelsea Products*, 197 F.2d 620, 624 (3d Cir. 1952), affg. 16 T.C. 840 (1951). See *Abatti v. Commissioner*, *supra*.

In the present case, petitioners' counsel admits that petitioners had notice of respondent's reliance on section 482 at least 5 weeks prior to the scheduled trial. Petitioners do not contend that such notice brings them within the limited circumstances which call for denying respondent the right to raise section 482, but, rather, petitioners contend they fall within the second category requiring the burden of proof to shift to respondent. We agreed at trial with petitioners, and we still agree. We note, however, that even if petitioners were to bear the burden of proof, we would find that they have met their burden of showing that respondent's section 482 allocation was arbitrary, capricious, or unreasonable.

## B. *Respondent's Reallocation of Income and Deductions*

Next, we turn to the substantive issues raised by respondent. His reliance on sections 482, 269, and 61 to reallocate all of A & R's income and deductions to Tahoe City Disposal and Kings Beach Disposal represents a frontal attack on a taxpayer's use of a personal service corporation. The impetus behind respondent's all-out attack on A & R stems from his apparent concern about the use of corporations for the principal purpose of obtaining the benefits associated with corporate retirement plans.

It is well known that operating a business in corporate form provides advantages not available to self-employed individuals.[7] In recent years, however, the driving force behind an ever increasing use (particularly by professionals) of corporations is the advantage of the richer tax deferral obtained through establishment of a corporate retirement plan.[8] For example, for taxable years beginning before 1982, an employee not otherwise covered by a retirement plan is limited to the use of an individual retirement account which permits qualified contributions not in excess of 15 percent of compensation or $1,500, whichever is less.[9] Sec. 219. Also for taxable years beginning before 1982, the tax deferred contribution available to a self-employed individual under a Keogh Plan (also known as H.R. 10 plan) is limited to the lesser of $7,500 per year or 15 percent of earned income.[10] Sec. 404(e)(1). For taxable years beginning after 1981, however, even active participants in employer-sponsored plans may contribute to an individual retirement account. Additionally, the maximum amount of a qualified contribution to an individual retirement account is increased to the lesser of $2,000 or 100 percent of compensation. The Economic Recovery Act of 1981, Pub. L. 97–34, sec.

---

[7]This includes medical reimbursement plans, death benefits, retirement plans, limited liability, lower corporate tax rates, etc. See Williams and Lamon, "Incorporation: The Risk-Reward Ratio," A.B.A.: The Lawyer's Handbook D5–1 (rev. ed. 1975).

[8]At least one commentator has stated that this is the "*raison d'etre*" behind professional service corporations. Battle, "The Use of Corporations by Persons Who Perform Services to Gain Tax Advantages," 57 Taxes 797, 803 (1979).

[9]This ceiling is $7,500 if the contributions are made by the individual's employer. Sec. 219(b)(7).

[10]With respect to self-employed individuals, no deferral benefits are available with respect to contributions attributable to compensation in excess of $100,000. Sec. 401(a)(17).

311, 95 Stat. 274–283 (1981). Similarly, for taxable years beginning after 1981, the maximum contribution to a Keogh Plan is increased to the lesser of $15,000 or 15 percent of income, and the amount of income that can be taken into account when computing the deduction is increased from $100,000 to $200,000. The Economic Recovery Act of 1981, Pub. L. 97–34, sec. 312, 95 Stat. 283–285 (1981).

In contrast,[11] under a qualified pension or profit-sharing plan, a corporate employee-shareholder can enjoy annual contributions on his behalf to defined contribution plans in an amount not exceeding $41,500. Sec. 415(c)(1)(A); IRS News Release 81–16, Feb. 4, 1981. Alternatively, under a qualified defined benefit pension plan, the maximum contribution is an amount that will provide him with an annuity of $124,500 or an annuity equal to his average compensation for his most remunerative 3 consecutive years. Sec. 415(b)(1); IRS News Release 81–16, Feb. 4, 1981. The corporate employee can also have a combination of benefits through contributions to both defined contribution plans and defined benefit plans subject to the rule of 1.4.[12] Sec. 415(e).[13]

Respondent's distaste for this use of the corporate form is not new. However, respondent has significantly altered his mode of attacking personal service corporations. Prior to

---

[11]Although there is no one figure that can be used for comparison of corporate benefits with noncorporate benefits, the figures following in the text do provide an indicator of how corporate plans generally are more favorable.

[12]The rule of 1.4 basically limits the combined benefits and contributions to no more than 140 percent of the maximum benefits or contributions that would otherwise be available under either of the types of plans. In turn, this limit is also restricted by the overall 25 percent of compensation limitation found in sec. 404(a)(7), which in turn has exceptions (such as when larger contributions are necessary to meet certain minimum funding standards provided by sec. 412).

[13]This explanation is merely the tip of an iceberg whose actual parameters can be outlined only by master technicians involved daily in this area of the tax law. For further comparisons of corporate and noncorporate retirement plans, see I. Grant, Subchapter S Taxation 67–77 (1974); W. Painter, Corporate and Tax Aspects of Closely Held Corporations 523–547, 568–571 (2d ed. 1981); Banoff, "Reducing the Income Tax Burden of Professional Persons by Use of Corporations, Joint Ventures, Subpartnerships and Trusts," 58 Taxes 968 (1979); Battle, "The Use of Corporations by Persons Who Perform Services to Gain Tax Advantages," 57 Taxes 797 (1979); Nolan, "Discrimination Against the Self-Employed," 64 A.B.A.J. 683 (1978); Zalutsky, "Comparison of a Professional Corporation With an Unincorporated Practice After ERISA," 34th Annual N.Y.U. Inst. on Fed. Tax. 1355 (1976); Williams & Lamon, "Incorporation: The Risk-Reward Ration," A.B.A.: The Lawyer's Handbook D5–1 (rev. ed. 1975).

August 8, 1969, respondent relied primarily on the so-called Kintner regulations[14] to attack professional service corporations. As a result of numerous successful taxpayer challenges to the regulations,[15] respondent announced on August 8, 1969, that he would no longer litigate the tax classification of professional service corporations formed under State professional corporations laws.[16]

Since that time, the Service has accepted professional service corporations that have respected their corporate form in conducting their businesses. As a result, the use of professional service corporations and other personal service corporations has spiraled without any significant legislation from Congress intended to halt such use of the corporate form.[17] In recognition of these facts, the Seventh Circuit recently stated:

---

[14] See sec. 301.7701-2(a)(5) and (h), Proced. & Admin. Regs., as they read prior to their revocation in 1977 by T.D. 7515, 1977-2 C.B. 482. The name attached to these regulations derives from the case *United States v. Kintner*, 216 F.2d 418 (9th Cir. 1954).

[15] See the cases cited in Rev. Rul. 70-101, 1970-1 C.B. 278.

[16] See T.I.R. 1019 (Aug. 8, 1969). See also Rev. Rul. 70-101, 1970-1 C.B. 278, where the Service also stated that it would recognize as a professional service corporation a corporation organized and operated as such under the general business corporation statute of its State.

[17] For example, in 1980, Congress added to the Code present sec. 414(m) which is designed to aggregate the employees of an "affiliated service group" for purposes of certain pension and profit-sharing provisions. Sec. 414(m) does not prohibit the use of personal service corporations to obtain the benefits of pension and profit-sharing plans. Rather, sec. 414(m) restricts the availability of those benefits in the cases of some personal service corporations (as well as other corporations). Sec. 414(m) was added to the Code by duplicate amendments in (1) the Miscellaneous Revenue Act of 1980, Pub. L. 96-605, sec. 201(a), 94 Stat. 3521, 3526 (1980); and (2) An Act To Make Miscellaneous Changes in the Tax Laws, Pub. L. 96-613, sec. 5(a), 94 Stat. 3579, 3580 (1980). Sec. 414(m) is effective for plan years ending after Nov. 30, 1980.

Further evidence can be found that Congress is aware of this disparate treatment between self-employed individuals and corporate shareholder-employees. In the Tax Reform Act of 1969, Congress enacted sec. 1379 which provides that the benefits available to shareholder-employees of subchapter S corporations from pension and profit-sharing plans are limited, for the most part, to the benefits available to self-employed individuals under H.R. 10 plans. A Senate Finance Committee amendment to the House bill (H.R. 13270) would also have provided in sec. 901 similar treatment for shareholder-employees of professional service corporations. Comm. on Finance, S. Rept. 91-552, Amendment (in the nature of a substitute) to H.R. 13270, p. 509. This provision was deleted on the Senate floor from the final Senate version of H.R. 13270. 115 Cong. Rec. 37922-37931 (1969). It is apparent from the debate over this provision that members of the Senate were aware of the use of personal service corporations to gain tax benefits from pension and profit-sharing plans. However, the Senate chose not to pass this provision limiting the benefits. 115 Cong. Rec., *supra*. See also Comm. on Finance, S. Rept. 91-552 to accompany H.R. 13270, pp. 270-272.

We think that our approach in this case of recognizing some vitality in personal service corporations accords with congressional intent. "A history of legislation targeted at personal service corporations, the absence of any special exclusion of such corporations from corporate taxation and the personal holding company tax provisions indicate that to some extent Congress has sanctioned the incorporation of service businesses for tax purposes." Battle, ["The Use of Corporations by Persons Who Perform Services to Gain Tax Advantages," 57 Taxes 797 (1979)] * * * at 802. [*Foglesong v. Commissioner*, 621 F.2d 865, 873 (7th Cir. 1980), revg. and remanding a Memorandum Opinion of this Court.]

The keynote in respondent's present position under sections 482, 269, and 61 is his contention that incorporation for the principal purpose of taking advantage of corporate pension and profit-sharing plans amounts to an evasion or avoidance of income taxes, an unclear reflection of income, and/or an assignment of income.[18] We disagree. Of course, a mere corporate skeleton, standing alone and without any flesh on its bones, will not suffice to provide its shareholder-employees with corporate retirement benefits. See *Roubik v. Commissioner*, 53 T.C. 365, 382 (1969) (Tannenwald, J., concurring). Once incorporated, the personal service business must be run as a corporation. Its shareholder-employees must recognize, respect, and treat their personal service corporation as a corporation. The corporation must accept the disadvantages[19] as well as advantages of incorporation. Once a corporation is

---

[18]Insofar as respondent contends that such use of a corporation results in tax avoidance, we note that this position appears inconsistent with his position in two revenue rulings. Rev. Rul. 76–363, 1976–2 C.B. 90; Rev. Rul. 70–238, 1970–1 C.B. 61. In Rev. Rul. 70–238, respondent held that the creation of a new domestic corporation to carry on the Western Hemisphere business of an existing domestic corporation for the principal purpose of obtaining the tax benefits provided by sec. 922 does not amount to tax avoidance under sec. 269. Similarly, in Rev. Rul. 76–363, the formation of a corporation for the principal purpose of securing the benefits available under subch. S of the Code did not amount to tax avoidance under sec. 269. We are aware that in a recent private letter ruling respondent attempted to distinguish these two rulings and held that the formation of a corporation for the principal purpose of obtaining the benefits of medical reimbursement plans or corporate retirement plans amounts to tax avoidance for purposes of sec. 269. Private Letter Ruling 7939003. (Private letter rulings have no precedential authority. Sec. 6110(j)(3).) In this ruling, respondent stressed that sec. 269 was meant to apply in those circumstances where allowance of a given benefit would be inconsistent with the scheme Congress was attempting to encourage in enacting a given provision or provisions of the Code.

[19]E.g., higher social security taxes, State franchise taxes, additional bookkeeping expenses, etc.

formed and all organizational and operational requirements are met, it should be recognized for tax purposes[20] regardless of the fact that it was formed to take advantage of the richer corporate retirement plans. In light of this general discussion, the following discussion of respondent's sections 482, 269, and 61 assertions will be directed at determining the existence of any specific or extenuating circumstances compelling the use of one of those sections.

### 1. Section 482

The first substantive issue is whether respondent's allocations are justified under section 482. Section 482 states:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.

Relying on this statute, respondent allocated all of A & R's income and deductions to Tahoe City Disposal and Kings Beach Disposal. In essence, respondent is attempting to utilize section 482 to ignore the corporate existence of A & R.

The purpose of section 482 is set forth in the regulations:

> (b) *Scope and purpose.* (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocation as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each

---

[20]We believe that this is the result the Service contemplated in Rev. Rul. 70–101, 1970–1 C.B. 278.

controlled taxpayer. *The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.* [1.482–1(b)(1), Income Tax Regs. Emphasis added.]

Section 1.482–2(b)(1), Income Tax Regs., deals specifically with circumstances involving the performance of services by one corporation for the benefit of another similarly controlled corporation:

Where one member of a group of controlled entities performs marketing, managerial, administrative, technical, or other services for the benefit of, or on behalf of another member of the group without charge, or at a charge which is not equal to an arm's length charge as defined in subparagraph (3) of this paragraph, the district director may make appropriate allocations to reflect an arm's length charge for such services.

Section 1.482–2(b)(3), Income Tax Regs., defines an arm's-length charge:

For the purpose of this paragraph an arm's length charge for services rendered shall be the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts. * * *

In the context of the present case, respondent may utilize section 482 to insure that the charges among the controlled entities represent arm's-length amounts.[21] Instead of making such an allocation, respondent chose to allocate all of A & R's income and deductions to Tahoe City Disposal and Kings Beach Disposal. The evidence in the present case indicates that A & R received the arm's-length value of the services it rendered to Tahoe City Disposal and Kings Beach Disposal. In addition, respondent has essentially conceded that the payments reflect arm's-length charges by agreeing that if the payments are not allowed as deductible management fees to A & R, they will be allowed almost in their entirety to Tahoe City Disposal and Kings Beach Disposal as deductible salary payments.

---

[21]In his assertions under sec. 482, respondent has not made any serious contention that there has been an evasion of taxes, and we agree. The primary question, therefore, is whether the "clear reflection of income" language is applicable. The Court of Claims recently held that under circumstances where the statutory construction of the tax law would otherwise permit the tax consequences in question, sec. 482 can only apply if the transaction is tainted by tax avoidance or tax evasion. *Ruddick Corp. v. United States*, 226 Ct. Cl.___, 643 F.2d 747 (1981).

Moreover, the cases respondent relies on do not support his position that without showing an arm's-length price for the services rendered, he may reallocate the entire price of such services from one corporation to another. In *Ach v. Commissioner, supra,* the taxpayer transferred her profitable sole proprietorship to her son's defunct corporation in exchange for the corporation's non-interest-bearing note. As a result of this transfer, the taxpayer was able to offset the income of her dress business against the net operating loss carryovers from her son's corporation. In sustaining most of respondent's allocations under section 482 we stated:

Plainly, this was not an arm's length transaction. The corporation was hopelessly insolvent, and it is utterly beyond belief that any unrelated third party would have sold a prosperous business for a non-interest bearing $30,705.57 note of such an insolvent maker where the level of earnings of that business was about $30,000 a year and rising, and where the seller contemplated continued fulltime management of the business without compensation. * * * [42 T.C. at 123.]

In *Borge v. Commissioner,* 405 F.2d 673 (2d Cir. 1968), affg. a Memorandum Opinion of this Court, also relied on by respondent, entertainer Victor Borge formed a corporation to which he transferred the assets of an unprofitable poultry business. In addition, Borge entered into an employment agreement with the corporation pursuant to which he agreed to perform entertainment services for the corporation in exchange for an annual salary of $50,000. The $50,000 salary was far less than the amount Borge's entertainment activities produced each year, and it was found that Borge would not have made a similar agreement in an arm's-length transaction. Accordingly, respondent properly allocated a larger amount of Borge's entertainment earnings directly to him.

In *Rubin v. Commissioner,* 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972), deciding on remand 51 T.C. 251 (1968), revd. and remanded 429 F.2d 650 (2d Cir. 1970), the taxpayer and his brothers owned during the relevant tax years all the stock of Park, a corporation which, pursuant to management contracts, provided management services to Dorman Mills and its subsidiaries, also corporations controlled by the taxpayer. The taxpayer's efforts accounted for all of Park's income from management services. The taxpayer apparently never entered into an employment contract with Park and during the time

he performed services for Dorman Mills as an employee of Park, he also received salaries from other corporations to which he rendered services. The taxpayer received from Park a substantially lower salary for his services than the amount received by Park from Dorman Mills. In light of these facts, we held that respondent properly allocated a greater portion of Park's income directly to the taxpayer. Although we did not specifically mention the lack of arm's-length dealing between the taxpayer and Park, it is clear that the result reached was intended to reflect an arm's-length approach to the transactions between them. The circumstances clearly indicated that the employment relationship between the taxpayer and Park did not resemble the type of relationship that would have resulted had the taxpayer been dealing at arm's length with an unrelated third party.[22]

In *Jones v. Commissioner*, 64 T.C. 1066 (1975), the taxpayer was an official court reporter for a Federal District Court. He formed a personal service corporation to loan out his services despite the legal requirement that an official court reporter be an individual and not a corporation. Furthermore, the taxpayer never entered into an employment agreement with his corporation, remained under the control of the judge to whom he was assigned, and personally certified the transcripts. Holding that the transactions between the taxpayer and his corporation were not at arm's-length, we stated (p. 1078):

In the situation here, an uncontrolled taxpayer could not have dealt with another uncontrolled taxpayer as Mr. Jones dealt with the corporation because the functions of Mr. Jones in reporting the proceedings by stenographic note taking and the functions of the corporation in producing, selling, and certifying the transcripts must, by statute, be performed by the official court reporter, who must be an individual.

The fact that petitioners in the present case chose to incorporate A & R for the primary purpose of obtaining the benefits of its retirement plans does not justify respondent's

---

[22]In *Rubin v. Commissioner*, 56 T.C. 1155(1971), affd. 460 F.2d 1216 (2d Cir. 1972), deciding on remand 51 T.C. 251(1968), revd. and remanded 429 F.2d 650 (2d Cir. 1970), we were also faced with the question of which party bore the burden of proof on the sec. 482 issue. There we held that if respondent had the burden of proof, he met that burden.

section 482 allocations. In addition, none of the cases relied on by respondent[23] support his sweeping reallocation of all service income from A & R to Tahoe City Disposal and Kings Beach Disposal. Accordingly, section 482 is inapplicable. This is true regardless of where the burden of proof lies. Respondent's 100-percent reallocation in the present case is arbitrary, capricious, and unreasonable. To utilize section 482 in the present context respondent's allocations must, at the least, be reasonable attempts to reflect arm's-length transactions among the related entities. We see no reasonableness in respondent's present allocations and find that the transactions, as structured, reflected arm's-length charges for the services performed.

## 2. Section 269

The second issue is whether respondent properly utilized his authority under section 269 to allocate A & R's income and deductions to Tahoe City Disposal and Kings Beach Disposal. Section 269 is available—

(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit, or other allowance * * *

The "principal purpose" for the acquisition of control of the corporation must have been the evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance not otherwise available. In the present case, the principal purpose for the formation of A & R was to secure the tax benefits of its retirement plans. We have already held that as a general proposition, the formation of a

---

[23]*Foglesong v. Commissioner,* 621 F.2d 865 (7th Cir. 1980), revg. and remanding a Memorandum Opinion of this Court, is still before this Court on remand from the Seventh Circuit. Respondent did not cite our Memorandum Opinion and the Appellate Court's opinion came down after the briefs were written in this case. The Seventh Circuit asked this Court to reconsider respondent's sec. 482 claim. Obviously it would be inappropriate for us to comment at this time on the merits of those claims, but we can mention that if sec. 482 is applicable in *Foglesong,* there are substantial factual differences distinguishing it from the present case.

corporation for the principal purpose of securing the tax benefits of retirement plans is not an evasion or avoidance of taxes.[24] Accordingly, section 269 does not apply.

Furthermore, even if the formation of a corporation for such a purpose were an evasion or avoidance of taxes, it would not be so in the present case because the benefits expected from A & R's plans are not available. (See the sec. 414(b) discussion, *infra.*)

### 3. Section 61

The third issue is whether section 61 applies to shift A & R's income and deductions. Respondent stated his position as follows: "[A & R] is a sham for tax purposes; it did not actually earn the management fees which it reported. Section 61." Without citing *Moline Properties v. Commissioner*, 319 U.S. 436 (1943), respondent apparently is asking us to disregard the corporate existence of A & R. This we decline to do. *Moline Properties v. Commissioner, supra* at 438–439, requires the recognition of a corporation as a separate entity if either (1) the purpose for the formation of the corporation is the equivalent of a business activity[25] or (2) the incorporation is followed by the carrying on of business. In the present case, A & R carried on a business subsequent to its incorporation. It hired employees and entered into employment contracts with them. It entered into management service contracts with Tahoe City Disposal and Kings Beach Disposal. Its employees respected its separate identity. It filed separate tax returns, paid taxes, kept separate books, formed pension and profit-sharing plans, etc. It rendered services through its two employees to the disposal companies. These subsequent acts amount to the carrying on of the business of a management company. Accordingly, A & R must be recognized as a viable entity for tax purposes. See *Jones v. Commissioner, supra* at 1076.[26]

---

[24]See note 19 *supra* and accompanying text.

[25]Because we hold that A & R carried on a business subsequent to its incorporation, we do not need to resolve whether the formation of a corporation for the purpose of obtaining the benefits of retirement plans is the equivalent of a business activity.

[26]It should also be noted that there is a strong presumption in the law favoring recognition of the corporation as a viable economic entity separate and distinct from its shareholders. *Klein v. Board of Supervisors*, 282 U.S. 19, 24 (1930).

Under his section 61 approach, respondent further asks us to attribute the employees of A & R (namely, Achiro and Rossi) to Tahoe City Disposal and Kings Beach Disposal on the basis that their actions as employees were controlled by those companies instead of A & R.[27] To do this we must, among other things, disregard their employment contracts with A & R and A & R's management contracts with Tahoe City Disposal and Kings Beach Disposal. Respondent relies on *Jones v. Commissioner, supra,* and *Roubik v. Commissioner,* 53 T.C. 365 (1969).

In *Jones* (see discussion, *supra*), this Court found that the taxpayer's personal service corporation was not a sham and that it engaged in substantial business activity. We also found, however, that the taxpayer performed services in his individual capacity because by law his corporation could not perform such services. Accordingly, we held that he assigned his income to the corporation. The present case is distinguishable. Here, we have found that Achiro and Rossi functioned as employees of A & R under valid exclusive employment agreements. In their capacities as employees, they rendered services to Tahoe City Disposal and Kings Beach Disposal pursuant to management contracts between A & R on the one hand and Tahoe City Disposal and Kings Beach Disposal on the other hand. Furthermore, the parties were not precluded by law from operating in corporate form as in *Jones.*

In *Roubik v. Commissioner,* 53 T.C. 365 (1969), four radiologists who had separate practices formed a personal service corporation ostensibly to carry on their practices. We found as a fact that the radiologists continued to carry on their prior separate practices and merely assigned their income to their corporation. *Lucas v. Earl,* 281 U.S. 111 (1930). Although they entered into employment agreements with their corporation, the corporation never entered into loan-out agreements with the hospitals or others for whom the radiologists performed their services. The doctors did not respect the corporate form after the personal service corporation was formed. That is not our situation here. Respondent, on whom the burden of proof

[27]We point out that, except to the extent respondent's oblique contentions here might be construed to the contrary, respondent never argued that petitioners occupied a common law employment relationship with the disposal companies. Accordingly, we do not raise this contention for respondent either here or under the sec. 414(b) discussion, *infra.*

rests, has not proved that A & R is not a viable corporation, or that the petitioners did not respect its separate existence and the contracts into which it entered with them and with others.

## C. Deduction of Management Fees

The fourth issue is whether the management fees paid by Tahoe City Disposal to A & R were expended for the purposes designated and whether they were ordinary and necessary business expenses.[28] This is the only issue where the burden of proof rests on petitioner. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Section 162 provides that "there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * a reasonable allowance for salaries or other compensation for personal services actually rendered."

Among the items deductible as business expenses under section 162(a) are management expenses. *Latham Park Manor, Inc. v. Commissioner*, 69 T.C. 199 (1977), affd. in an unpublished opinion 618 F.2d 100 (4th Cir. 1980); sec. 1.162–1(a), Income Tax Regs. The test of deductibility of payments made for services (e.g., compensation or management fees) is whether they are reasonable and are in fact payments purely for services. Sec. 1.162–7(a), Income Tax Regs.

Respondent has conceded that if the payments are disallowed as management fees, they should be allowed almost in their entirety as employee salary deductions. Since the services rendered are the same regardless of their designation as either management services or employee services, respondent has, in effect, conceded that the fees were reasonable in amount.[29] See sec. 1.162–7(b)(3), Income Tax Regs. We have already held that the employment contracts and management services contracts are bona fide contracts. We have found that

---

[28]It appears from respondent's cursory coverage of sec. 162 on brief that he has virtually abandoned his contentions thereunder.

[29]The only direct evidence on this issue came from Tahoe City Disposal's accountant who testified that in his expert opinion, the management fees were ordinary and necessary expenses. Under the circumstances of this case, we find that this testimony also satisfies petitioner's burden of proving deductibility for these fees under sec. 162.

all relevant parties have recognized the separate and distinct existence of one another and have complied with their obligations under the contracts. It would be wholly inconsistent in light of these factors to reach any conclusion other than that the fees were expended for management services, and we so hold.

### 4. Section 414(b)

The final issue is whether the employees of A & R and the employees of Tahoe City Disposal should be aggregated pursuant to section 414(b).[30] Respondent asserts that once so aggregated, A & R's pension and profit-sharing plans (which cover only petitioners) discriminate in favor of officers, shareholders, and highly compensated persons because those plans do not include Tahoe City Disposal's employees and because the North Tahoe P-S Plan's contributions and benefits are not commensurate with A & R's plans. Accordingly, respondent contends that A & R's pension and profit-sharing plans are not qualified trusts under section 401, and the contributions made to such plans should be treated as income to petitioners under the provisions of sections 402(b) and 83(a). Petitioners agree that *if* the employees of A & R are aggregated with the employees of Tahoe City Disposal, then A & R's pension and profit-sharing plans are not qualified trusts, and the contributions to those plans should be income to petitioners. Petitioners contend, however, that section 414(b) does not require the aggregation of the employees of A & R with the employees of Tahoe City Disposal.

Section 414(b)[31] requires aggregation of the employees of all corporations which are members of a controlled group of corporations as defined in section 1563(a). Section 1563(a) applies to both parent-subsidiary and brother-sister controlled

---

[30]We address this issue last because its resolution in favor of respondent results in a slightly lower deficiency than would have resulted had we resolved any of the previous issues in his favor. This discrepancy is attributable primarily to timing differences resulting from the various fiscal years of petitioners, A & R, Tahoe City Disposal, and Kings Beach Disposal.

[31]Sec. 414(b) provides:

(b) EMPLOYEES OF CONTROLLED GROUP OF CORPORATIONS.—For purposes of sections 401, 408(k), 410, 411 and 415, all employees of all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a), determined without regard to section 1563(a)(4) and (e)(3)(C)) shall be treated as employed by a single employer. * * *

groups. The brother-sister controlled group determination consists of two tests. Sec. 1563(a)(2).[32] The 80-percent test requires that five or fewer persons alone or in combination have at least an 80-percent interest in each of two or more organizations.[33] The 50-percent test requires that the same five or fewer persons have more than a 50-percent interest in each organization, taking into account the interests of each person only to the extent that such interests are identical with regard to each organization.

Section 1.1563–1(a)(6), Income Tax Regs., defines voting powers for purposes of section 1563(a) as follows:

in determining whether the stock owned by a person (or persons) possesses a certain percentage of the total combined voting power of all classes of stock entitled to vote of a corporation, consideration will be given to all the facts and circumstances of each case. A share of stock will generally be considered as possessing the voting power accorded to such share by the corporate charter, bylaws, or share certificate. *On the other hand, if there is any agreement, whether express or implied, that a shareholder will not vote his stock in a corporation, the formal voting rights possessed by his stock may be disregarded in determining the percentage of the total combined voting power possessed by the stock owned by other shareholders in the corporation, if the result is that the corporation becomes a component member of a controlled group of corporations. Moreover, if a shareholder agrees to vote his stock in a corporation in the manner specified by another shareholder in the corporation, the voting rights possessed by the stock owned by the first shareholder may be considered to be possessed by the stock owned by such other shareholder if the result is that the corporation becomes a component member of a controlled group of corporations.* [Emphasis added.]

---

[32]Sec. 1563(a)(2) provides:

BROTHER-SISTER CONTROLLED GROUP.—Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing—

(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and

(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

[33]We are not presented in this case with the problem originally faced by this Court in *Fairfax Auto Parts of Northern Virginia v. Commissioner,* 65 T.C. 798 (1976), revd. 548 F.2d 501 (4th Cir. 1977), cert. denied 434 U.S. 904 (1977), and presently before the Supreme Court in *Vogel Fertilizer Co. v. United States,* 225 Ct. Cl. ___ , 634 F.2d 497 (1980), cert. granted 450 U.S. 994 (1981). The issue in those cases is whether for purposes of the 80-percent ownership test a shareholder's stock should only be taken into account if he owns stock in each member of the controlled group.

Achiro and Rossi each owned 50 percent of the voting stock of Tahoe City Disposal and each held record title to 24 percent of the stock of A & R. Renato Achiro, Achiro's brother and Rossi's brother-in-law, held record title to the remaining 52 percent of the voting stock of A & R. Considering only record title, Tahoe City Disposal and A & R were not a brother-sister controlled group under section 1563(a)(2). However, we have found that Renato implicitly agreed that he would either not vote his stock in A & R or vote his stock in the manner specified by Achiro. Under the regulations, the validity of which has not been challenged by the parties, Renato's voting rights may be disregarded or attributed to Achiro. Therefore, Achiro and Rossi are deemed each to have 50-percent interests in Tahoe City Disposal and A & R (or Achiro is deemed to have a 76-percent interest in A & R), and the corporations constitute a brother-sister controlled group.

Since the corporations form a controlled group, the employees of A & R and the employees of Tahoe City Disposal must be aggregated under section 414(b) for purposes of section 401. Such a holding complies with the intent of Congress in enacting section 414(b) as expressed in H. Rept. 93–779, at 49 (1974), 1974–3 C.B. 292:

The committee, by this provision, intends to make it clear that the coverage and antidiscrimination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation. For example, if managerial functions were performed through one corporation employing highly compensated personnel, which has a generous pension plan, and assembly-line functions were performed through one or more other corporations employing lower-paid employees, which have less generous plans or no plans at all, this would generally constitute an impermissible discrimination. * * *

A & R was formed for the express purpose of rendering managerial services to Tahoe City Disposal and Kings Beach Disposal. In 1975 and 1976, A & R's employees, Achiro and Rossi, were officers, shareholders, and highly compensated. Sec. 1.401–4(a)(1)(i), Income Tax Regs. The "assembly-line functions" of the day-to-day waste disposal and dump operations were carried on by the employees of Tahoe City Disposal and Kings Beach Disposal. This is the very kind of situation Congress had in mind when it enacted section 414(b).

Accordingly, for the years 1975 and 1976, A & R's pension and profit-sharing plans were not qualified because they

discriminated in favor of Achiro and Rossi who were officers, shareholders, and highly compensated. Sec. 401. Contributions made to such plans must be included in the gross income of Achiro and Rossi under sections 402(b) and 83(a).

Petitioners contend that the prescribed relationship between the stockholders of A & R and the stockholders of Tahoe City Disposal did not exist in 1975 or 1976. Petitioners' contention rests squarely on their assertion that Renato's 52-percent interest in A & R is not attributable to them and must be considered as owned by an unrelated and uncontrolled party when determining whether A & R and Tahoe City Disposal are members of a controlled group of corporations. In support of this contention, petitioners list numerous reasons for the acquisition of a controlling interest in A & R by Renato and cite two recent decisions of this Court, *Garland v. Commissioner*, 73 T.C. 5 (1979), and *Kiddie v. Commissioner*, 69 T.C. 1055 (1978).

Petitioner's factual arguments are without merit. Renato testified that it was his brother's wish that he acquire a controlling interest in A & R and that was the only reason for his acquisition of A & R's stock. Achiro believed that benefits from increased contributions to A & R's pension and profit-sharing plans were possible if Renato owned 52 percent of A & R's voting stock. We have found as a fact that Renato implicitly agreed not to vote his stock or to vote as Achiro instructed him.

Petitioner's reliance on *Garland v. Commissioner, supra,* and *Kiddie v. Commissioner, supra,* is similarly misplaced. The *Kiddie* decision states that attribution of partnership characteristics to a partner does not occur unless the partner controls the partnership. In that case, we held that a corporate partner, who never owned more than a 50-percent interest in a partnership, is not attributed the employees of the partnership when determining whether the corporate partner's pension and profit-sharing plans are discriminatory. In *Garland*, the parties agreed that neither section 414(b) nor section 414(c) applied. Accordingly, our decision here, which rests on the

applicability of section 414(b), does not conflict with our *Kiddie* and *Garland* decisions.[34]

*Decisions will be entered under Rule 155.*

---

[34]Present sec. 414(m) (see note 18 *supra*) has to a large extent resolved the problems raised by the *Kiddie* and *Garland* decisions.