MELVIN WILLIAMS AND MARY WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MELVIN WILLIAMS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentWilliams v. CommissionerDocket Nos. 28141-87, 28142-87.United States Tax CourtT.C. Memo 1992-153; 1992 Tax Ct. Memo LEXIS 165; 63 T.C.M. (CCH) 2396; T.C.M. (RIA) 92153; March 17, 1992, Filed *165 Decisions will be entered under Rule 155. 1. Held: Respondent's notices of deficiency, determining, by a source and application of funds analysis, that petitioners had unreported income, from petitioner Melvin Williams' narcotics distribution activities, is sustained due to petitioners' failure to carry their burden of proof. Held, further, petitioners failed to carry their burden of proof respecting an alleged cash hoard. 2. Held, further, respondent substantially carried her burden of proof respecting the increased deficiencies asserted in her amended answer. 3. Held, further, petitioners are liable for the additions to tax for fraud under sec. 6653(b)(1). 4. Held, further, to the extent we have determined there to be underpayments of tax, such underpayments are, in their entirety, attributable to fraud and, therefore, the additions to tax under sec. fraud and, therefore, the additions to tax under sec. 6653(b)(2) shall apply to such underpayments of tax in their entirety. 5. Held, further, petitioners are liable for the additions to tax under sec. 6661. Joseph L. Gibson, Jr., for petitioners. David E. Gaston and Mary*166 Corrigan Gorman, for respondent. HALPERNHALPERNMEMORANDUM OPINION HALPERN, Judge: Respondent, in two notices of deficiency, determined income tax deficiencies and additions to tax with respect to petitioner Melvin Williams' 1980 and 1984 taxable years, and petitioners Melvin and Mary Williams' 1981, 1982, and 1983 taxable years, for which they filed joint returns, as follows: Additions to TaxYearDeficiencySec. 6653Sec. 6653Sec. 6661(b)(1) 1(b)(2)1980$   6,075.49$  3,037.49----198170,410.7336,098.36----198258,258.2729,129.1350% of the$ 14,654.57interest dueon $ 58,258.271983114,944.1957,472.1050% of the28,736.05interest dueon $ 114,944.191984126,565.5363,282.7650% of the31,641.38interest dueon $ 126,565.53Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and *167 all Rule references are to the Tax Court Rules of Practice and Procedure. In her amended answer, respondent asserted increased deficiencies of $ 20,763.27 for 1980, $20,980.25 for 1981, $3,975.25 for 1982, $ 8,560.66 for 1983, and $ 45,968.10 for 1984, plus additions to tax. After concessions and other recomputations, the total deficiencies and additions to tax at issue are as follows: Additions to TaxYearDeficiencySec. 6653Sec. 6653Sec. 6661(b)(1) 1(b)(2)1980$  21,215$ 10,608----198175,46637,733----198250,33725,16950% of the$ 12,584interest dueon $ 50,3371983130,65765,32950% of the32,664interest dueon $ 130,6571984115,14357,57250% of the28,786interest dueon $ 115,143The deficiencies and additions to tax are based upon respondent's determination, using the "source of income and application of funds" method (source and application of funds method) of reconstructing*168 income, that petitioner (or petitioners) underreported income as follows: Table 1 - Unreported Income19801981198219831984$ 45,570.63$ 157,608.73$ 110,056.39$ 270,751.58$ 232,193.12Respondent constructed tables of source funds per return, applications per return, additional source funds, and additional applications of funds. Consolidating respondent's tables somewhat, the following tables demonstrate how the above understatements were determined: Table 2 - Source of Funds198019811982SalariesMelvin Williams$ 8,075.60----Mary Williams6,957.00----Melvin & MaryWilliams--$ 15,613.65$ 20,271.00Net rental income--1,190.09--Depreciation 1541.671,011.85--Interest income------Chance winnings----10,000.00Additional incomeon amended 1040----15,000.00Insurance claim25.00----Fed tax refundMelvin Williams--15.45--Mary Williams--497.00--Melvin and MaryWilliams565.39--963.14State tax refundMary Williams--150.09--Melvin Williams--46.88--Melvin & MaryWilliams241.22--74.20Birthday present20.00----Loan proceeds10,000.00----Insurance--2,000.00----2,039.46----482.90----122.76--Social securitydeath benefit--323.50--Sale of Cadillac--10,000.00--Decrease in creditunion account(withdrawals)------Additional source fundscredited by resp.----11.00Total sources$ 26,425.88$ 33,493.63$ 46,319.34*169 19831984SalariesMelvin Williams--$ 30,000.00Mary Williams--4,869.00Melvin & MaryWilliams$ 30,674.00--Net rental income----Depreciation 1----Interest income--515.00Chance winnings35,000.0080,000.00Additional incomeon amended 1040----Insurance claim----Fed tax refundMelvin Williams----Mary Williams----Melvin and MaryWilliams--574.15State tax refundMary Williams----Melvin Williams----Melvin & MaryWilliams154.00--Birthday present----Loan proceeds15,985.00--Insurance2,500.00--25,469.75----------Social securitydeath benefit----Sale of Cadillac----Decrease in creditunion account(withdrawals)--3,609.13Additional source fundscredited by resp.----Total sources$109,782.75$ 119,567.28*170 Table 3 - Application of Funds198019811982Applicationsper return$ 5,218.79$ 14,712.63$ 8,514.49Losses1,344.40----Increase in creditunion account(deposits)690.62350.551,278.93Personal LivingExpenses19,852.0057,952.0035,428.00Mitchell Propertiesfee------Cash seizedfrom residence------Cash seized indrug purchase------Cash downpaymenton Maserati------Jewelry purchases290.001,560.257,687.52Fur purchases----5,000.00Park Avenueimprovements--1,000.0019,666.67Park Avenuefurniture------Investment in"Progressive"--17,100.00--Motor Vehicleaccessories------Mortgage Payments4,054.862,187.01--Forest HillsState Bank2,674.60341.00--Bel Air Auto Mart22,429.0931,672.8020,000.00Scrapp10,538.0953,709.4148,721.07Personalexpenditures4,904.0610,516.7110,079.05Totalexpenditures$ 71,996.51$ 191,102.36$ 156,375.7319831984Applicationsper return$ 19,332.47$ 12,547.65Losses----Increase in creditunion account(deposits)1,617.04--Personal LivingExpenses8,322.008,322.00Mitchell Propertiesfee83,000.00--Cash seizedfrom residence--29,874.76Cash seized indrug purchase--100,000.00Cash downpaymenton Maserati10,000.00--Jewelry purchases7,687.5264,403.76Fur purchases5,000.009,300.00Park Avenueimprovements22,475.4216,857.92Park Avenuefurniture6,850.006,850.00Investment in"Progressive"----Motor Vehicleaccessories1,000.001,462.09Mortgage Payments----Forest HillsState Bank--1,129.52Bel Air Auto Mart81,469.1648,012.00Scrapp110,180.863,327.17Personalexpenditures23,599.8649,673.53Totalexpenditures$ 380,534.33$ 351,760.40*171 Table 4 - Source and Application of Funds198019811982Total Sourcesof funds$ 26,425.88$ 33,493.63$ 46,319.34Total Applicationsof funds71,996.51191,102.36156,375.73Understatementof Income$ 45,570.63$ 157,608.73$ 110,056.3919831984Total Sourcesof funds$ 109,782.75$ 119,567.28Total Applicationsof funds380,534.33351,760.40Understatementof Income$ 270,751.58$ 232,193.12The issues for decision are: (1) Whether petitioners had unreported income during the years in question; and (2) whether petitioners are liable for the additions to tax. Some facts have been stipulated and are so found. The stipulations of facts filed by the parties and accompanying exhibits are incorporated by this reference. Petitioner Melvin Williams was an inmate in the Federal Penitentiary, Lewisburg, Pennsylvania, when he filed his petitions in this case. Petitioner Mary Williams resided in Baltimore, Maryland, when she filed her petition in this case. BackgroundOn December 5, 1984, a task force comprised of agents from the Drug Enforcement Agency (DEA), Internal Revenue Service (IRS) and Baltimore City Police *172 Department (BCPD) seized various documents from petitioners' home; pursuant to a search warrant. The warrant directed the seizure of such documents in connection with an investigation of a possible violation of Title 21 of the United States Code, which in part deals with unlawful drugs. The Government also seized relevant documents from third parties in connection with this investigation. In substantial part, based on such documents, respondent determined the deficiencies and additions to tax outlined above. Respondent's position is that petitioner Melvin Williams ran an illegal narcotics distribution organization and that petitioners received substantial unreported income therefrom. Among other things, respondent offers evidence of (1) the books and records of an automobile dealership -- the Bel Air Auto Mart (the Auto Mart), showing substantial payments made by petitioners; (2) third party statements of account and other documents showing payments made by petitioners' corporation, Scrapp Investment, Inc. (Scrapp), greatly in excess of Scrapp's known sources of funds; and (3) third party statements of account, other third party documents, and petitioners' own documents, showing*173 payments made by petitioners to third parties. Respondent argues that those payments, being in excess of petitioners' known sources of funds, imply a taxable source and, consequently, an underpayment of tax. Respondent further argues (1) that petitioners concealed assets by placing them in Scrapp; (2) that petitioners concealed income by paying bills through the Auto Mart; and (3) that those actions were part of an overall scheme to conceal petitioners' assets and income and thereby fraudulently avoid payment of the income tax. I. Unreported IncomeA. IntroductionA taxpayer is required to keep sufficient records to enable respondent to determine his correct tax liability. Sec. 6001. In the absence of such records, respondent may compute the taxpayer's income by any method that clearly reflects income. Sec. 446(b); Sutherland v. Commissioner, 32 T.C. 862, 866-867 (1959). Where the taxpayer has failed to report amounts of income, and where available records are not sufficient to otherwise establish income, the Government may employ indirect methods. Holland v. United States, 348 U.S. 121 (1954). Respondent reconstructed *174 petitioners' income for the years at issue using the source and application of funds method, which has long been regarded as a reasonable method of determining income. See Meier v. Commissioner, 91 T.C. 273, 295-296 (1988); Kotmair v. Commissioner, 86 T.C. 1253 (1986). The source and application of funds method is based on the assumption that the amount by which the taxpayer's applications of funds exceed his known sources of income is taxable income, absent some showing by taxpayer of a nontaxable source. Taglianetti v. United States, 398 F.2d 558, 562 (1st Cir. 1968), affd. 394 U.S. 316 (1969). B. Burden of ProofRespondent's determinations in a notice of deficiency are presumed correct, insofar as the burden of proof is normally on petitioners to establish that such determinations are in error. Rule 142(a). 1. New MattersThe above general rule notwithstanding, respondent must sustain the burden of proof on all new matters pleaded. Rule 142(a). Where, during the course of the litigation, respondent asserts an increased deficiency, that increase is clearly a new matter. Achiro v. Commissioner, 77 T.C. 881, 890 (1981);*175 Smith v. Commissioner, T.C. Memo. 1986-254. Thus, respondent bears the burden of proving the increased amount of the deficiency. Id. Here, respondent bears the burden of proof respecting the increased deficiencies for 1980, 1981, and 1983. Where, during the course of the litigation, respondent does not assert an increased deficiency, but instead relies on somewhat different grounds for her determination, that too may constitute a new matter. As generally understood, the determinative question is whether the present basis for respondent's determination is consistent with the original theory described in the notice of deficiency. The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. * * * However, if the assertion in the amended answer either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. * * *Achiro v. Commissioner, 77 T.C. at 890 (citations omitted). We are faced here with*176 a situation in which respondent has, following the issuance of her deficiency notice, and in a revised source and application of funds analysis, set forth certain, different applications of funds. The initial difficulty lies in adequately defining the scope of the theory advanced in the deficiency notice. Here, the statement attached to the deficiency notice states that petitioners understated their taxable incomes and that respondent's determinations were based upon a source and application of funds analysis. Also attached to those materials are the computations of the IRS agent who performed that analysis. Those computations specify the applications allegedly made by petitioners. It is unclear whether those computations, asserting specific applications of funds by petitioners, are part of the overall theory advanced by respondent in the notice of deficiency. If so, then respondent, insofar as she alleges different applications of funds, might be viewed as advancing a different theory and might, under the new matter doctrine, be required to bear the burden of proof. However, we do not believe that respondent here is required under the new matter doctrine to bear the burden*177 of proof with regard to the new applications of funds she has set forth. A distinction can, and should, be drawn between the theory on which respondent relies and the details regarding respondent's application of that theory to the facts. For example, if respondent's notice of deficiency stated that taxpayer had unreported income from a bank robbery, in which taxpayer allegedly escaped in a blue car, it would not constitute a new matter if, in her answer, respondent alleged that taxpayer actually escaped in a black car instead of a blue one. While respondent included the detail of the car's color in the notice of deficiency, presumably to offer some support for her bank robbery theory, such detail is not part of the theory. Admittedly, it may be difficult to distinguish between theory and detail, but, as the above example demonstrates, such distinction does exist and the failure to recognize it would exaggerate the scope of the new matter doctrine. Here, the question of what particular applications of funds were made by petitioners clearly is not trivial, as is the detail of the car's color in the above example. Nonetheless, the particular applications alleged in the source *178 and application of funds analysis, attached to the notice of deficiency, are only material supporting respondent's unreported income theory, rather than part of the theory itself. Thus, the alleged applications currently relied upon by respondent serve merely to develop respondent's original theory of unreported income, demonstrable by a source and application of funds analysis. Here, with respect to the years 1982 and 1984, respondent has not brought a new matter before the Court. To the extent that respondent continues to assert a deficiency for those years, petitioners fail to have, by virtue of the new matter doctrine, the burden of proof placed on respondent. 2. Overall Validity of Respondent's DeterminationsPetitioners claim that respondent's notice of deficiency is arbitrary and therefore should not be afforded the usual presumption of correctness. In addressing that contention, we note that the courts generally will not look behind the Commissioner's determination, even if it is based on hearsay or other evidence inadmissible at trial. Anastasato v. Commissioner, 794 F.2d 884, 886-887 (3d Cir. 1968); Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984);*179 Suarez v. Commissioner, 58 T.C. 792, 813 (1972). However, where the notice of deficiency is shown to be arbitrary, that is sufficient to find for the taxpayer unless respondent adequately cures such arbitrariness. Helvering v. Taylor, 293 U.S. 507 (1935). Consequently, it is often said that the presumption of correctness will not be given effect in an unreported illegal income case unless the Commissioner produces "some predicate evidence connecting the taxpayer to the charged activity". Gerardo v. Commissioner, 552 F.2d 549, 554 (3d Cir. 1977). However, as we pointed out in Tokarski v. Commissioner, 87 T.C. 74, 76 (1986), that requirement appears to have been imposed in cases where "there was no evidence that the taxpayer had actually received anything during the period in issue." Since such evidence is present in this case, the connection-to-income producing-activity requirement would not appear to apply in this case. Rather than rely on this observation, however, we will consider as a preliminary matter whether respondent has demonstrated a requisite linkage between petitioner*180 Melvin Williams and the alleged tax-generating activity, which is the illegal distribution of narcotics. Petitioner Melvin Williams has a long history of illegal involvement with narcotics, and with crime in general. In the years 1957 through 1984, Melvin Williams accumulated a considerable criminal record, ranging from auto larceny to conspiracy to distribute narcotics. Petitioner was first arrested for illegal drug activity in 1963. Walter Robinson, a long-time purchaser of cocaine from Melvin Williams, testified in 1985, before a special grand jury, that he had been purchasing cocaine from Melvin Williams since 1969. In 1974, Melvin Williams was arrested for conspiracy to distribute narcotics and was subsequently sentenced to a 15-year prison term with 5-years special parole. Walter Robinson testified in 1985 that he began purchasing cocaine from petitioner Melvin Williams for commercial distribution purposes in 1983. Walter Robinson also testified, in 1985, that Melvin Williams used a beeper service to facilitate his drug operations, and that a man named Glenn Hawkins was a lieutenant in Melvin Williams' drug organization. In 1984, Melvin Williams was indicted for, among*181 other offenses, attempting to possess cocaine with intent to distribute, in violation of 21 U.S.C. section 841(a)(1) and 18 U.S.C. section 2. 1 The underlying facts of the criminal case were that, in 1984, a year at issue in this proceeding, Melvin Williams attempted to purchase four kilos of cocaine, at a price of $ 100,000, from an undercover DEA agent. In 1985, Melvin Williams was convicted on all counts on which he had been indicted. Petitioner Melvin Williams is currently incarcerated at a Federal prison medical facility in Rochester, Minnesota. Based upon the foregoing and the record as a whole, we find that respondent has introduced ample evidence of petitioner Melvin Williams' connection with the illegal sale and distribution of narcotics during the taxable years here in question. That requirement, *182 if here applicable, has been satisfied. Consequently, the presumption of correctness remains in force: petitioners continue to bear the burden of going forward as well as the burden of persuasion as to the deficiency determined in the notice of deficiency. 3. The Validity of Particular DeterminationsPetitioners also argue that, aside from the alleged arbitrary character of the deficiency determinations overall, particular determinations of applications of funds are arbitrary. Thus, petitioners contend that to the extent that the notice of deficiency is based upon such arbitrary determinations, it too is arbitrary and should not be deemed presumptively correct. Helvering v. Taylor, 293 U.S. 507 (1935). 2*183 a. Jewelry(1) Respondent's ReasoningPetitioners contend that respondent's source and application of funds analysis with respect to amounts expended for jewelry is arbitrary. In arriving at her determination, respondent has relied heavily upon a balance sheet prepared for petitioner Mary Williams by petitioners' accountant (based upon information provided by petitioners) in August 1984, and an appraisal of various of petitioners' assets prepared for the DEA in January 1985. The August 1984 balance sheet demonstrates a value of $ 33,165 of jewelry owned at that time. The January 1985 appraisal reflects a value of $ 93,725 for jewelry owned at that time. Respondent determined that the difference -- $ 60,560 -- is due to purchases of jewelry made between August and December 1984, which amount entered into respondent's calculation of income unreported for 1984. 3*184 Documented invoices in the amount of $ 13,946.20 have been produced, leaving $ 19,218.80 of the $ 33,165 appearing on the 1984 balance sheet to be explained. Reasoning that petitioners had insufficient funds before the years in question to support a luxurious standard of living and because there were documented invoices for 1979 through 1981, respondent determined that the unexplained $ 19,218.80 worth of jewelry purchases likely occurred between 1982 and the first 6 months of 1984. Accordingly, respondent allocated 40 percent of such amount to each of 1982 and 1983, and 20 percent of such amount to the first 6 months of 1984, such amounts being $ 7,687.52, $ 7,687.52, and $ 3,843.76, respectively. Those amounts entered into respondent's calculation of income unreported for such periods. (2) Efforts to Determine Nontaxable SourcePetitioners challenge as arbitrary respondent's determinations as to funds expended for jewelry. Petitioners argue that respondent made insufficient efforts to determine whether any of petitioner's jewelry came from a nontaxable source, such as gifts or inheritance. Petitioners misunderstand respondent's obligation. To support her analysis as*185 to petitioners' expenditures, respondent must present "evidence supporting the inference that [petitioners' expenditures] are attributable to currently taxable income." Holland v. United States, 348 U.S. 121, 137 (1954). That burden can be met either (1) by negating possible nontaxable sources of income or (2) by showing a likely taxable source. In Holland, as here, the taxpayers argued that "the Government failed to adduce adequate proof because it did not negative all the possible nontaxable sources." Id. at 137. The Supreme Court, however, did not agree: The Government's proof, in our view, carried with it the negations the petitioners urge. Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient. * * *Id. at 137-138. Here, as in Holland, the showing of a likely source relieves respondent of the obligation to negate nontaxable sources. Moreover, even where such duty remains in force, that duty is limited. "This is not to*186 say that the Government may disregard explanations of the defendant reasonably susceptible of being checked. But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant." Id. at 138. If petitioners in this case received any jewelry as a gift, such is a matter peculiarly within their knowledge and theirs is the burden of demonstrating such to the Court. (3) When the Jewelry Was ObtainedPetitioners also argue that respondent's allocations to the particular years 1982 through 1984 are arbitrary in that respondent has no evidence to suggest that purchases were made in those years as opposed to others. We agree with respondent that it is unlikely that petitioners could have afforded such extravagances before the years in question. Between 1974 and 1979, Melvin Williams served out a prison sentence for conspiracy to distribute narcotics and therefore was not in a position to generate substantial income. Mary Williams was a substitute teacher in the Baltimore School system throughout the period in question, and had lifetime earnings*187 through the end of 1979 of only $ 46,466.37. Thus, respondent's conclusion that petitioners had insufficient funds prior to the years in question is supported by the evidence. 4 Thus, respondent's notice of deficiency, insofar as it is based on the determinations regarding jewelry expenditures, is not arbitrary and is, therefore, presumptively correct. (a) FursPetitioners also argue that respondent's determinations with respect to purchases of*188 furs were arbitrary. Respondent's reasoning here was fundamentally the same as that used respecting the jewelry. The 1984 balance sheet showed a value of $ 10,000, while the 1985 appraisal showed a value of $ 31,900. Consequently, respondent concluded that purchases in 1984 were responsible for the difference of $ 21,900. 5 Since invoices for 1984 already demonstrated $ 12,600 of furs purchases, respondent determined that an additional $ 9,300 was applied in 1984. As for the $ 10,000 shown on the 1984 balance sheet, $ 5,000 was allocated to each of 1982 and 1983, since those are the years in which petitioners had ample funds to spare for such luxuries. We find that those determinations are not arbitrary. Insofar as respondent's notice of deficiency is based upon such determinations, it is not arbitrary and is, therefore, presumptively correct. *189 (b) Residence ImprovementsPetitioners contend that respondent's determinations with regard to improvements to the Park Avenue residence are arbitrary. (i) Respondent's ReasoningPetitioners' home initially cost $ 40,000 in 1981. It was valued on the 1984 balance sheet at $ 100,000. 6 Respondent concluded that the disparity was due to $ 60,000 in improvements made between 1981 and 1984. After allowing $ 1,000 for documented improvements in 1981, respondent allocated one third of the remaining $ 59,000 -- $ 19,666.67 -- to 1982. Then, after allowing for documented improvements of $ 6,650 in 1983 and $ 1,032.50 in 1984, respondent allocated one-half of the remaining $ 31,650.83 -- $ 15,825.42 -- to each of 1983 and 1984. (ii) Reasonableness*190 of Respondent's ValuationPetitioners contend, initially, that respondent's valuation of the Park Avenue residence at $ 100,000 is arbitrary. We disagree. Respondent's valuation is based upon the balance sheet prepared for petitioner Mary Williams by petitioners' accountant, which was based upon information provided by petitioners, and constitutes, in effect, an admission by petitioners. Under those circumstances, we find respondent's use of such valuation to be reasonable; petitioners' attempt to place the burden of proof on respondent is, therefore, ineffective. C. Have Petitioners Shown Respondent's Notice of Deficiency to be Erroneous? 1. FursPetitioners challenge respondent's determinations as to funds expended for furs. In their opening brief, petitioners argue that the furs in question are old and outdated and that, consequently, the funds applied for their purchase are less than respondent has determined. Moreover, petitioners contend that two of the furs were won, as opposed to purchased with funds having taxable origins. However, petitioners have provided no evidence to support those contentions. Consequently, they fail to carry their burden of proof*191 with respect to such amounts. 2. Residence ImprovementsFirst, petitioners argue that respondent's valuation of petitioners' residence at $ 100,000 is incorrect. However, petitioners' naked assertion that the $ 100,000 valuation is inaccurate is insufficient to carry their burden of proof. Petitioners also argue that any increase in value of their home is attributable to general market forces, as well as their own home improvement efforts, and not to any monetary expenditures. Having failed to offer any proof as to what improvements they have made or the effect of market forces on their home, however, petitioners fail to carry their burden of proof. Petitioners further contend that respondent improperly failed to remove from her source and application of funds analysis $ 15,000 allocated to improvements of the Park Avenue residence. Petitioners refer to respondent's agent's attempt, at trial, to testify from a memorandum of interview allegedly indicating that petitioners paid $ 3,500 and $ 12,500 for improvements in 1980 and 1981, respectively. Petitioners' hearsay objection to that testimony was upheld. The Court did not, however, direct respondent to expunge any figure*192 from the source and application of funds analysis. Petitioners' contention is without merit. Respondent's determination regarding improvements to the residence is reasonable and, to the extent petitioners bear the burden of proof, presumptively correct. 3. FurniturePetitioners argue that respondent incorrectly allocated $ 7,309 to furniture expenditures. Petitioners, however, have offered no admissible evidence in support of that claim and, consequently, fail to carry their burden of proof in this respect. 74. Contribution to Progressive World EnterprisesPetitioners argue that $ 16,000 stipulated to have been given to Progressive World Enterprises (Progressive) should not be treated as an expenditure by petitioners*193 "as no such sum was ever given to that corporation". Generally, a stipulation of fact is controlling on the parties, and will be enforced by the Court. Stamos v. Commissioner, 87 T.C. 1451, 1454 (1986). Rule 91 provides in pertinent part: (e) Binding Effect: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. * * *Justice may require the Court to disregard stipulations between the parties where the evidence contrary thereto is substantial or the stipulation is clearly contrary to facts in the record. Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 194 (1989). In the instant case, however, no evidence produced by petitioners, or in the record itself, refutes the stipulation. Consequently, justice requires no result other than that petitioners be bound by their agreement. Petitioners also argue that respondent presented*194 no evidence of the amounts allegedly provided to Progressive. Petitioners' argument, however, misses the point. For it is petitioners who, insofar as they wish to disprove respondent's notice of deficiency, bear the burden of proof. Having presented no evidence that such amounts were not paid to Progressive, and having stipulated that such amounts were paid by Melvin Williams, petitioners fail to carry their burden of proof. 5. AutomobilesPetitioners also argue that certain monies expended for purchases of a 1983 BMW and a 1984 BMW, from the Auto Mart, were refunded in the same year and therefore should not be treated as expenditures by petitioners. The only evidence they offer, however, is the testimony of John Quincey Edwards, the owner of the Auto Mart, who testified that he did not know if any monies were refunded or not. He clearly did not, as petitioners contend, testify that any monies were returned to Melvin Williams. Petitioners fail to carry their burden of proof as to this item. 6. A BedPetitioners contend conclusorily that they did not, as respondent alleges, purchase a bed for $ 2,660 from Niagara of Metro Washington. Mere assertion is insufficient*195 to carry the burden of proof. 7. A Tow TruckPetitioners contend that respondent improperly charged petitioners with expenditures, through Scrapp, of $ 3,490 for a tow truck in 1980, since, as respondent recognizes, the purchase price of the tow truck was charged to petitioners' "exchange account" with the Auto Mart. 8 Consequently, petitioners argue, no cash was expended by petitioners, either directly or through Scrapp, for such purchase. We agree and hold that respondent's determination with respect to that item is incorrect. 8. Expenditures by ScrappPetitioners contend that respondent incorrectly*196 held them accountable for certain expenditures by Scrapp Investment. Specifically, respondent determined that, between 1980 and 1984, Scrapp expended $ 226,476.60 more than its otherwise available funds and that petitioners provided the difference. At trial, respondent produced evidence demonstrating that Melvin Williams was the source of those funds. Petitioners' accountant, Benjamin King, has stated that "When Scrapp needed money Melvin would always put it in. He was putting money into Scrapp for his wife." Nonetheless, petitioners suggest that approximately $ 268,000 in loans was provided to Scrapp by stockholders other than petitioners. However, petitioners have produced no evidence that such other persons provided Scrapp with funds. As of August 20, 1984, the balance sheet of James Rogers, who is Mary Williams' father and the president of Scrapp, reflects no stockholder's loan to Scrapp. Moreover, petitioners' accountant, Benjamin King, stated at trial that Melvin Williams provided the approximately $ 268,000 to Scrapp, and that such sum was not repaid to Melvin Williams in the same year. Petitioners also contend that even if it is appropriate to hold them accountable*197 for Scrapp's expenditures, certain amounts should nonetheless be stricken from the source and application of funds analysis. Specifically, they argue that certain amounts are double-counted, appearing both as investment expenditures under "cost of living" and as Scrapp expenditures. Petitioners demonstrated nothing, however, beyond the mere possibility that such might be the case; that is insufficient to carry their burden of proof. Petitioners further contend that they were erroneously held accountable for a consulting fee of $83,000, 9 paid by Scrapp Investment to Clarence Mitchell. Petitioners argue that the money used to pay the fee was borrowed by Scrapp from a third party, and therefore did not come from petitioners. However, petitioners offer no admissible evidence to substantiate their claim. Petitioners fail to carry their burden of proof in this respect. *198 Similarly, petitioners contend that $ 41,000 of the funds expended by Scrapp toward the purchase of the property located at 4300 Liberty Heights Avenue, Baltimore, Maryland, was acquired from a third party and therefore did not come from petitioners. Once again petitioners offer no admissible evidence and therefore fail to carry their burden of proof. Similarly, petitioners contend that $ 10,000 of the monies expended by Scrapp for purchase of the above-mentioned property derive from monies already on deposit and from sources other than petitioners. Petitioners offer no evidence, however, and fail to carry the burden of proof. 9. SummaryOnly as to the expenditure of $ 3,490 for a tow truck in 1980 have petitioners satisfied their burden of proof and shown a determination of respondent's to be incorrect. Accordingly, we hold for petitioners as to that item. However, in all other respects, petitioners have failed to show respondent's determinations to be either arbitrary or incorrect. Accordingly, with the exception of $ 3,490 incorrectly determined to be an expenditure of petitioners' in 1980, and except to the extent that respondent has made concessions during the course*199 of this litigation, we sustain respondent's notices of deficiency, for the taxable years here in question, in their entirety. D. Has Respondent Shown Deficiencies in Excess of the Notice of Deficiency? As noted earlier, respondent bears the burden of establishing any deficiencies in excess of those determined in the notice of deficiency. Archiro v. Commissioner, 77 T.C. 881, 890 (1981); Smith v. Commissioner, T.C. Memo. 1986-254. With respect to the years in which respondent has determined an increased deficiency (1980, 1981, and 1983), we shall determine, regarding each new application of funds asserted by respondent, whether respondent has carried her burden of proof. 1. 1980a. Increases to Credit Union AccountRespondent has produced a statement of account indicating an increase of $ 690.62 in the balance of the account during 1980. Accordingly, respondent carries her burden of proof as to that item. b. Personal Living ExpensesRespondent asserts that petitioners spent $ 19,852 for personal living expenses in 1980. In the calculations attached to the notice of deficiency, respondent alleged $19,872 in expenditures*200 for personal living expenses. Since respondent does not now assert a greater amount, and in fact asserts less, this item is not a new matter, and respondent does not bear the burden of proof in this respect. c. JewelryRespondent has produced receipts demonstrating that petitioners expended $ 290 for jewelry purchases in 1980. Accordingly, respondent carries her burden of proof as to this item. d. Mortgage PaymentsRespondent asserts that petitioners expended $ 4,054.86 for mortgage payments in 1980. Since that item was not set forth by respondent in the notice of deficiency, it is a new matter respecting which respondent bears the burden of proof. Respondent has produced copies of mortgage records of Virginia Mortgage and Investment Company and Ashburton Savings and Loan, showing mortgage payments, made by petitioners, totaling $ 3,788.86 for 1980. Accordingly, respondent sustains her burden of proof to this extent. e. Forest Hill State BankRespondent asserts that petitioners paid $ 2,674.60 to Forest Hill State Bank in 1980. Since that item was not set forth by respondent in the notice of deficiency, it is a new matter respecting which respondent bears*201 the burden of proof. Respondent has produced a copy of the amortization schedule of the auto loan account, showing $ 956.47 in loan payments by petitioners in 1980 for a 1976 Cadillac. 10 Respondent has also produced a loan reference history card for Forest Hill State Bank, showing $ 1,708 in loan payments by petitioners in 1980 for a 1980 Cadillac. 11 Accordingly, respondent sustains her burden of proof to the extent of $ 2,664.47. f. Bel Air Auto MartRespondent asserts that petitioners*202 paid $ 22,429.09 to the Auto Mart in 1980. The Auto Mart's payment receipts journal shows $ 18,597.49 in payments received from petitioners, either individually or through Scrapp. There is no evidence of additional expenditures by petitioners. Accordingly, respondent sustains her burden of proof to the extent of $ 18,597.49. g. Scrapp InvestmentRespondent asserts that Scrapp spent $ 10,538.09 in excess of its ostensibly available funds, and that such amount was provided by petitioners. However, in the calculations attached to the notice of deficiency, respondent only set forth $ 6,440.34 of applications respecting Scrapp Investment. Thus, the additional $ 4,097.75 is a new matter, respecting which respondent must carry the burden of proof. As discussed earlier, we are convinced that whatever excess funds Scrapp may have expended derive from petitioners: the only issue, therefore, is how much Scrapp spent in excess of its ostensibly available funds in 1980. (1) Scrapp's ExpendituresScrapp's form 1120 tax return for 1980 shows $ 4,044 was spent for improvements. An additional $ 7,500 is shown by Scrapp's 1981 tax return also to have been spent in 1980 for improvements. *203 Scrapp's 1980 tax return also indicates that Scrapp spent $ 3,422.27 for mortgage payments between June 1979 and June 1980. Half of this amount -- $ 1,711.14 -- is allocable to 1980. Overall, respondent has demonstrated $ 13,255.14 in Scrapp expenditures for 1980. (2) Scrapp's Available FundsBetween June 1979 and June 1980, Scrapp had a loss of $ 793.44, half of which ($ 396.72) represents Scrapp's losses for the first 6 months of 1980. Between June 1980 and June 1981, Scrapp had $ 6,227.54 of income, half of which ($ 3,113,77) represents Scrapp's income for the last 6 months of 1980. Overall, Scrapp's net income for 1980 was $ 2,717.05. (3) ConclusionAssuming that Scrapp had no available funds at the start of 1980 (which seems likely since petitioners could easily have demonstrated the reverse if that were the case), Scrapp spent $ 10,538.09 in excess of its ostensibly available funds in 1980. Respondent has sustained her burden of proof in this respect. h. Personal ExpendituresRespondent asserts that petitioners spent $ 4,904.06 for personal expenditures in 1980. Respondent presents receipts, copies of checks signed by Mary Williams, charge card and *204 department store statements of account, and similar documentation which, collectively, demonstrate personal expenditures by petitioners in 1980 totaling $ 4,904.06. Respondent has sustained her burden of proof as to that item. 2. 1981a. Increases to Credit Union AccountRespondent has produced a statement of account indicating an increase of $ 350.55 in the balance of the account during 1981. Accordingly, respondent carries her burden of proof as to this item. b. Personal Living ExpensesThe schedule of petitioners' personal living expenses, prepared by petitioners' accountant and based upon information produced by petitioners, indicates that $ 57,952 was spent for this purpose in 1981. 12 Accordingly, respondent carries her burden of proof as to this item. *205 c. JewelryIn the calculations attached to her notice of deficiency, respondent set forth $ 1,560.25 in expenditures by petitioners for jewelry in 1981. Since respondent does not now assert a greater amount, that item is not a new matter, and respondent does not bear the burden of proof in this respect. d. Residence ImprovementsPetitioners stipulated to having spent $ 1,000 in 1981 for improvements to their residence at 2206 Park Avenue, Baltimore, Maryland. Accordingly, respondent carries her burden of proof as to that item. e. Progressive World EnterprisePetitioners stipulated to having spent $ 17,100 in 1981 on behalf of Progressive. As we stated earlier, this stipulation is binding. Accordingly, respondent carries her burden of proof as to that item. f. Mortgage PaymentsRespondent asserts that petitioners expended $ 2,187.01 for mortgage payments in 1981. Respondent has produced copies of mortgage records of Virginia Mortgage and Investment Company and Ashburton Savings and Loan, showing mortgage payments, made by petitioners, of $ 962.01 and $ 2,444.01, respectively, and totaling $ 3,406.02. We are limited to respondent's assertion, however. *206 Accordingly, we find that respondent has sustained her burden of proof as to the $ 2,187.01 of mortgage payments for 1981. g. Forest Hill State BankRespondent asserts that petitioners paid $ 341 to Forest Hill State Bank in 1981. Since respondent set forth no such expenditure in the notice of deficiency, that is a new matter respecting which respondent bears the burden of proof. Having uncovered no proof of such expenditure, respondent fails to sustain that burden. h. Bel Air Auto MartRespondent asserts that petitioners paid $ 31,672.80 to the Auto Mart in 1981. Respondent's calculations attached to the notice of deficiency only set forth $ 23,500 in such expenditures. Consequently, the additional $ 8,172 is a new matter respecting which respondent bears the burden of proof. The Auto Mart's payment receipts journal shows $ 23,500 in payments received from petitioners, either individually or through Scrapp. Other Auto Mart documents evidence an additional $ 5,440 in payments for 1981. In addition, the journals of J.Q.E., Ltd., indicate that seven payments of $ 341.60 each were made by petitioners to J.Q.E., Ltd., in 1981. Respondent has shown total payments*207 of $ 7,831.20 in excess of the $ 23,500 originally set forth. Accordingly, with respect to the $ 8,172 respecting which respondent bears the burden of proof, respondent sustains that burden to the extent of $ 7,831.20. i. Scrapp InvestmentRespondent asserts that Scrapp spent $ 53,709.41 in excess of its ostensibly available funds, and that such amount was provided by petitioners. The calculations attached to the notice of deficiency set forth $ 55,076.20 in such expenditures. Since respondent does not now assert a greater amount, and in fact asserts a lesser amount, that is not a new matter, and respondent does not bear the burden of proof as to that item. j. Personal ExpendituresRespondent asserts that petitioners spent $ 10,516.71 for personal expenditures in 1981. Since that item was not set forth in respondent's notice of deficiency, it is a new matter respecting which respondent bears the burden of proof. Respondent presents receipts, copies of checks signed by Mary Williams, charge card and department store statements of account, and similar documentation which, collectively, demonstrate expenditures by petitioners in 1981 totaling $ 10,416.09. Respondent*208 has sustained her burden of proof to this extent. 3. 1983a. Increases to Credit Union AccountRespondent has produced a statement of account indicating an increase of $1,617.04 in the balance of the account during 1983. Accordingly, respondent carries her burden of proof as to this item. b. Personal Living ExpensesThe calculations attached to respondent's notice of deficiency set forth $ 8,332 in personal living expenses. Since respondent now claims exactly such amount, that is not a new matter, and respondent need not carry the burden of proof respecting this item. c. Mitchell Properties FeeRespondent asserts that petitioners, through Scrapp, paid fees totaling $ 83,000 in 1983 to Mitchell Properties, Inc., for consulting services. The calculations attached to respondent's notice of deficiency set forth only $ 5,000 in such expenditures. Accordingly, the additional $ 78,000 is a new matter respecting which respondent bears the burden of proof. Preliminarily, we note that it is clear that the fee paid to Mitchell Properties was at least $ 50,000. Petitioners have stipulated that such fee was paid in 1983 and was not refunded. Moreover, James E. *209 Rogers testified before a Grand Jury on May 8, 1985, as president of Scrapp, that payments totaling $ 83,000 had been made by Scrapp to Mitchell Properties. While that testimony might be sufficient to demonstrate, by a preponderance of the evidence, that such payments were in fact made, there is no evidence that such payments were made in 1983. Accordingly, we hold that respondent has carried her burden of proof to the extent of showing that, beyond the $ 5,000 respecting which petitioners bear the burden of proof, an additional $ 45,000 was paid by Scrapp to Mitchell Properties (for a total fee of $ 50,000). d. MaseratiRespondent asserts that petitioners paid $ 10,000 in cash as a downpayment on a Maserati. Petitioners have made a stipulation to this effect. Accordingly, respondent carries her burden of proof with respect to this item. e. JewelryRespondent asserts that petitioners expended $ 7,687.52 for jewelry in 1983. The calculations attached to respondent's notice of deficiency set forth $ 10,956.10 in such expenditures. Since respondent does not claim an increased expenditure, and in fact claims a lesser one, respondent has not introduced a new matter *210 and thus is not required to bear the burden of proof as to this item. f. FursRespondent asserts that petitioners expended $ 5,000 for furs in 1983. The calculations attached to respondent's notice of deficiency set forth that amount. Thus, respondent has not introduced a new matter and is not required to bear the burden of proof as to that item. g. Residence ImprovementsRespondent asserts that petitioners paid $ 22,475.42 in expenditures for the improvement of petitioners' Park Avenue residence. In the calculations attached to her notice of deficiency, respondent set forth $ 20,000 in such expenditures. Accordingly, the additional $ 2,475.42 is a new matter respecting which respondent bears the burden of proof. Having failed to offer any evidence of such expenditures, respondent fails to sustain that burden. h. Park Avenue FurnitureRespondent asserts that petitioners paid $ 6,850 in expenditures for furniture for the Park Avenue residence in 1983. In the calculations attached to her notice of deficiency, respondent set forth that amount. Thus, respondent has not introduced a new matter and need not bear the burden of proof as to that item. i. Motor*211 Vehicle AccessoriesRespondent asserts that petitioners, through Scrapp, expended $ 1,000 in 1983 for motor vehicle accessories. Since respondent made no such determination in her notice of deficiency, that is a new matter respecting which respondent bears the burden of proof. Respondent has produced receipts showing that such accessories were ordered and paid for by Scrapp. Accordingly, respondent sustains her burden of proof in this respect. j. Bel Air Auto MartRespondent asserts that petitioners paid $ 81,469.16 in expenditures to the Auto Mart. The calculations attached to the notice of deficiency set forth $ 71,621 in such expenditures. Thus, the additional $ 9,848.16 is a new matter, respecting which respondent bears the burden of proof. Respondent has produced documents demonstrating that the full $ 81,469.16 was paid by petitioners to the Auto Mart in 1983. Accordingly, respondent sustains her burden of proof as to that item. k. Scrapp InvestmentRespondent asserts that petitioners paid $ 110,180.86 in expenditures through Scrapp (in addition to any discussed separately above). The calculations attached to respondent's notice of deficiency set forth*212 $ 73,325.98 in such expenditures. Accordingly, the additional $ 36,854.88 is a new matter with respect to which respondent bears the burden of proof. Respondent has produced various evidence, consisting of tax returns and receipts, of Scrapp's expenditures above known sources, demonstrating that petitioners gave Scrapp $ 111,039.30 in 1983. However, we are limited by respondent's assertion. We hold respondent to have carried her burden of proof as to the additional $ 36,854.88 respecting funds given to Scrapp. 1. Personal expendituresRespondent asserts that petitioners spent $ 23,599.86 for personal expenditures in 1983. Since respondent's deficiency notice made no such determination, this is a new matter, with respect to which respondent bears the burden of proof. Respondent has produced receipts, copies of checks signed by Mary Williams, charge card and department store statements of account, and similar documentation which, collectively, demonstrate expenditures by petitioners totaling more than this amount in 1983. Consequently, respondent sustains her burden of proof in this respect. E. Was There a Cash Hoard? Petitioners argue that they should be credited*213 with an additional $ 108,000 in source funds of nontaxable origins for 1981. Petitioners argue that, upon the death of Mr. Williams' mother (Dorothy Williams) in 1981, a cash hoard was discovered, from which they were left $ 108,000. At trial, three witnesses testified as to the existence of the cash hoard. One witness, Ms. Efie Cole, who testified that she first saw the box in or before 1976, stated that she had not seen the box since 1979. The other two witnesses, who testified as to the actual discovery of the box, are sisters of Mary Williams. Moreover, their testimony was somewhat contradictory and was, overall, unconvincing. Frances White, a sister of Mary Williams, testified at trial that only herself, Mary Williams, and Melvin Williams were present when the cash hoard was discovered; yet, Rita Rogers, another sister of Mary Williams, testified that she too was present when the cash hoard was discovered. Moreover, Alfred Williams, the brother of Melvin Williams, testified that he was unaware of any monies found on the date of Dorothy Williams' death. The dispute as to who was present when the cash hoard allegedly was discovered, as well as Alfred Williams' testimony*214 that he knew of no such monies, casts doubts that such cash hoard ever existed. Moreover, an examination of Dorothy Williams' financial situation demonstrates the extreme improbability that she could have amassed over $ 100,000 in her lifetime. Clearly, Dorothy Williams, whose lifetime earnings were $ 48,690.90, and who did not have a will probated at death, did not earn that sum. Nor did she inherit it from her husband, who had $ 81,910.14 in lifetime earnings and also did not have a will probated at death. Petitioners allege, however, that Dorothy Williams was a frequent and extraordinarily successful gambler, and that she amassed well over $ 100,000 in winnings from the Maryland lottery, the street numbers, and the race track. While several witnesses testified for petitioners on that point, no documentary evidence of such winnings was presented, nor did any witness testify to having paid Dorothy Williams any winnings on any given occasion. Additionally, the Maryland State Lottery Agency had no record of Dorothy Williams ever having won any monies. Moreover, Dorothy Williams applied for public assistance in both 1977 and 1978, indicating that her only income was $ 250 a month*215 from social security. Those statements were made at least 1 and 2 years, respectively, after Dorothy Williams had, according to Ms. Cole, accumulated a cash hoard in excess of $ 50,000. We think that an unlikely scenario. We find that Dorothy Williams could not have amassed $ 108,000 or left such a sum to petitioners. F. Government Release of WitnessesPetitioners object to "the Government's use of any allegation that required the testimony of any witness that [respondent's counsel] elected to release at the resting of the case." The basis of that objection, however, is unclear. Respondent is not required to call witnesses necessary to make petitioners' case: that is what petitioners' counsel is for. Moreover, it is difficult to see how petitioners might have been prejudiced. The Court held neither party to a pretrial memorandum witness list; even after respondent rested, petitioners' counsel could have subpoenaed the released witnesses to testify on petitioners' behalf. That petitioners' counsel neglected to do so may in some sense be objectionable, but such objection cannot properly be addressed by this Court. II. The Additions to Tax: FraudGenerally, respondent's*216 determination of additions to tax for fraud, under section 6653(b), will be sustained only if respondent can demonstrate by clear and convincing evidence that a portion of the underpayment for the year at issue is due to fraud with intent to evade taxation. Sec. 7454(a); Rule 142(b). Respondent need not demonstrate that the entire underpayment is the result of fraud; it is sufficient that some portion of the underpayment be proven the result of fraud. Lee v. Commissioner, 466 F.2d 11, 16-17 (5th Cir. 1972). Where fraud is shown respecting any portion of the underpayment of a given year, the entire underpayment for such year is subject to the fraud addition. Sec. 6653(b) and 6653(b)(1). 13 We must, therefore, determine if respondent can show, by clear and convincing evidence, some underpayment with fraudulent intent for each year at issue. *217 A. Indicia of FraudIn Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), the Court of Appeals for the Ninth Circuit observed that circumstantial evidence may be sufficient basis for a determination of fraudulent intent. Id. at 307. Bradford also set forth a nonexclusive list of factors suggesting fraud. Such badges of fraud include: (1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities. Id.Bradford further held: The following facts support a finding of fraud: (1) [Taxpayer] engaged in illegal activities; (2) he failed to file returns for four consecutive years; (3) he failed to report substantial business income * * * all of which he knew constituted taxable income; (4) he dealt in cash to avoid scrutiny of his finances; (5) he filed false W-4's;(6) he made efforts to conceal his laetrile distribution activities; (7) he failed to make estimated tax payments; (8) he failed to cooperate with the revenue agent during the audit examination; and (9) *218 he failed to maintain adequate records. [Id. at 308; citations omitted.]B. Melvin Williams1. Illegal ActivitiesMany of the factors relied upon by the Ninth Circuit Court of Appeals in Bradford are present here. Petitioner Melvin Williams was engaged in the illegal distribution of narcotics. This is significant because such activity inherently involves elements of misrepresentation or concealment of such activity from Government authorities. Such elements are highly relevant and suggest a reason why petitioner Melvin Williams would commit fraud. 14 In McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), we stated: While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to evade tax * * * the Court is entitled to consider such evidence * * * in determining the intent of the taxpayer in doing certain acts, because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal*219 his receipt of those same funds from the Government with intent to evade tax.Similarly, it is a fair inference that petitioner Melvin Williams, who participated in the illegal distribution of narcotics and must surely have acted to misrepresent or conceal such activity from the Government, would, similarly, not hesitate to misrepresent or conceal the income received therefrom to avoid both the income tax and the discovery of the underlying activity itself. 2. Inadequate RecordsFurther, petitioner Melvin Williams has admitted that he failed to maintain adequate records of such illegal drug sales for each of the years at issue. Such failure has long been regarded as a badge of fraud indicating a course of action designed to evade tax. Parsons v. Commissioner, 43 T.C. 378, 395 (1964). *220 That fact, in conjunction with the failure to report large amounts of income from an income-producing activity, is a particularly strong indication of fraud. Otsuki v. Commissioner, 53 T.C. 96, 109-110 (1969). 3. Concealed Funds and AssetsPetitioners 15 also acted to conceal their assets and "launder" their illegal income. As discussed earlier, Scrapp expended funds far in excess of its earnings; such funds can only have come from petitioners. Thus, petitioners secretly transferred funds to Scrapp, which would purchase assets belonging, except in name, to petitioners. The Maserati, for example, is titled in Scrapp's name and was paid for by Scrapp, but belongs, in reality, to petitioners. When the Maserati was seized by the DEA on December 5, 1984, petitioner Melvin Williams personally sought its return in a pleading in which he stated that he had an equitable interest in the Maserati and that legal title belonged to the Auto Mart (which had sold the vehicle and held a lien placed thereon). *221 In addition, several consideration-free transfers to Scrapp support the conclusion that petitioners were using Scrapp to conceal their assets. On July 22, 1981, petitioner Melvin Williams transferred property at 2305 Wichita Avenue, Baltimore, Maryland, to Scrapp for no consideration. On July 22, 1981, petitioner Mary Williams transferred property at 3928 Cranston Avenue, Baltimore, Maryland, to Scrapp for no consideration. Also on July 22, 1981, James Rogers, the father of petitioner Mary Williams, deeded to Scrapp the property located at 4401 Rokeby Road, Baltimore, Maryland, for no consideration. The logical inference is that the purpose of those transfers was to conceal, through Scrapp's ostensible ownership, substantial assets that, in reality, belonged to petitioners. 16 Overall, petitioners' use of Scrapp to conceal assets constitutes a badge of fraud. 17*222 That conclusion is bolstered by an examination of petitioner Melvin Williams' dealings with the Auto Mart. 18 During the years at issue, petitioners, individually and through Scrapp, paid nearly $ 200,000 to the Bel Air Auto Mart, which, during those years, expended approximately the same amount in car and truck purchases and payments to third parties on their behalf. 19 It is difficult to see what purpose that arrangement might serve, other than laundering funds and concealing assets. John Quincey Edwards, owner of the Auto Mart, explained at trial how the exchange account operates: Well, you bought a car from me and give me some money today, and I might not put the deal through for a week, so you just put it in the exchange account until the deal went through and then they credited where the monies was [sic] supposed to be credited. It might be for you, it might be for her, it might be for anybody.*223 We find Mr. Edwards' testimony unconvincing. Mr. Edwards fails to explain why there is any need to keep funds in an account until the deal "goes through" or how one can even purchase a vehicle without the deal "going through". Moreover, even assuming that the stated operation of the exchange account serves a necessary or legitimate purpose, neither petitioners nor Mr. Edwards has offered a plausible explanation for petitioners using the exchange account to satisfy obligations to third parties. Petitioners contend that they made purchases through the Auto Mart merely to take advantage of the discount at which Mr. Edwards could purchase vehicles from other auto dealers and dealerships. As noted above, that explanation does not explain other payments to third parties through the Auto Mart. Moreover, the record indicates that, at least at certain points in time, petitioners had paid to the Auto Mart amounts far in excess of those required for contemplated auto purchases, suggesting that the safekeeping of funds in the account was not just a means of purchasing vehicles, but was in itself an end of the arrangement. As of May 1983, petitioner Melvin Williams had paid to the Auto *224 Mart approximately $ 16,000 over and above any vehicles purchased therefrom, including the purchase price of a Maserati purchased in May 1983. Notwithstanding that fact, Mr. Edwards did not refund the balance to petitioner. Instead, Mr. Edwards established an account receivable due from petitioners in the amount of $ 29,088 and placed a $ 25,000 lien on the Maserati; thus, petitioner Melvin Williams, who was in fact still entitled to a refund, continued to contribute funds to the exchange account, despite the absence of any legitimate reason for so doing. At trial, petitioners neither denied nor explained those actions. 20*225 We are convinced that petitioner Melvin Williams used the Auto Mart to conceal or launder funds earned from the illegal distribution of narcotics and hold that to be a badge of fraud. 4. Use of CashFurther, petitioners dealt in cash to avoid scrutiny of their finances, a factor suggesting fraud. Bradford v. Commissioner, 796 F.2d 303, 308 (9th Cir. 1986). In his personal capacity, petitioner Melvin Williams dealt exclusively in cash: he admits to having declined to even maintain a checking account during the years at issue. During this time, many large cash transactions occurred, most notably with the Auto Mart. Between 1980 and 1984, petitioners made total payments to Auto Mart of nearly $ 200,000. Those transactions were generally in cash. John Quincey Edwards, the owner of the Auto Mart, testified that he would sometimes go and get cash from petitioner Melvin Williams in the city (Baltimore), and that sometimes petitioner Melvin Williams brought cash to him. On January 30, 1981, petitioners paid approximately $ 35,000 in cash, personally, as the balance due for their home at 2206 Park Avenue, Baltimore, Maryland, and approximately $ 51,000 in*226 cash, through Scrapp Investment, to purchase property at 4300 Liberty Heights Avenue, Baltimore Maryland. In 1982, petitioners, through Scrapp Investment, paid $ 10,000 in cash to Advance Federal Savings and Loan for a money market certificate. In 1983, petitioners, acting through Scrapp Investment, made cash payments to Clarence Mitchell totaling at least $ 50,000. Also in 1983, petitioner Melvin Williams paid $ 10,000 in cash for a Maserati. Another instance of dealing in large sums of cash can be found in the circumstances of petitioner Melvin Williams' arrest in 1984, at which time he gave $ 100,000 in cash to Walter Robinson and Glenn Hawkins to purchase cocaine. Also in 1984, approximately $ 30,000 in cash was found in petitioners' Park Avenue residence and Maserati at the time of seizure. In the same year, petitioner Melvin Williams paid $ 1,032.50 in cash for a satellite dish for the Park Avenue residence. Given the evidence, as described above, of petitioners' efforts to conceal their income and assets, petitioners' extensive and unexplained use of cash can only be viewed as part of a scheme to impede scrutiny of their finances. That is a badge of fraud. Bradford v. Commissioner, 796 F.2d at 308.*227 5. Understatement of IncomeFinally, we observe that petitioner has consistently and substantially understated his income, a fact that even, "standing alone, is persuasive evidence of fraudulent intent to evade taxes." Estate of Beck v. Commissioner, 56 T.C. 297, 364 (1971). See also Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986); Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962). "Their understatements of income were so large, regular, and frequent, extending over a period of at least 11 years, that there is no escape from the inference of a deliberate intention to defraud the Government of the taxes lawfully due it." Estate of Beck v. Commissioner, supra at 364. In the case at hand, we find that petitioners' substantial understatements over the course of at least 5 years, between 1980 and 1984, permit, if not require, a similar inference. Further, discrepancies of 100 percent or more between the total net income and the reported net income for several successive years strongly evidence an intent to defraud the Government. 21Rogers v. Commissioner, 111 F.2d 987 (6th Cir. 1940),*228 affg. 38 B.T.A. 16 (1938). For the years 1980 to 1984, petitioners reported net income of $ 9,011.08, $ 3,615.41, $ 37,730.65, $ 46,945.53, and $ 102,836.35, respectively. As can be computed from the determinations made herein, they understated their incomes by $ 41,462.90, $ 156,826.11, $ 110,056.38, $ 235,276.16, and $ 232,193.11, respectively. Thus, for the years in question, the discrepancies were 460 percent, 4,338 percent, 292 percent, 501 percent and 226 percent, respectively. We find this to constitute a consistent and substantial understatement of income strongly indicating fraud. 6. SummaryIn view of all the foregoing, we hold*229 that respondent has shown by clear and convincing evidence that petitioners understated their income with respect to each of the taxable years here in question and that some part of such understatement in each year was due to petitioner Melvin Williams' fraudulent intent to evade taxation. C. Mary WilliamsSection 6653(b) requires that the addition to tax for fraud must be proven with respect to each spouse separately. Consequently, we must determine if fraudulent intent has been shown by clear and convincing evidence with respect to petitioner Mary Williams for the years 1981 through 1983, for which petitioners filed joint returns. Much of the above discussion regarding Melvin Williams is here relevant, insofar as it pertains to both petitioners. To the extent applicable to petitioner Mary Williams, that discussion is incorporated herein. In addition, certain items are worthy of discussion. 1. Understatement of IncomeAs noted earlier, the consistent and substantial understatement of income, "standing alone, is persuasive evidence of fraudulent intent to evade taxes." Estate of Beck v. Commissioner, 56 T.C. at 364. See also Patton v. Commissioner, 799 F.2d at 171;*230 Merritt v. Commissioner, 301 F.2d at 487. Here, we find that, given the extent of the understatements, even 3 consecutive years constitutes a sufficiently consistent pattern on which to base an inference of fraud. That view is supported by Rogers v. Commissioner, 111 F.2d 987 (6th Cir. 1940), which, as noted earlier, held that discrepancies of 100 percent or more between total net income and reported net income for several successive years strongly indicate fraud. Here, the discrepancies greatly exceed 100 percent, easily meeting the standard set forth in Rogers. Although Mary Williams' substantial and consistent understatements of tax, standing alone, may constitute sufficient evidence of fraud, there is additional evidence from which fraud can be inferred in the present case. 2. Use of CashMary Williams, like Melvin Williams, dealt extensively in cash. A significant number of the Auto Mart receipts, for thousands of dollars, are in the name Mary Williams since she wrote no checks to the Auto Mart during the years at issue, all of these payments were in cash -- apparently toward the same goal of laundering funds through the*231 Auto Mart and thereby frustrating any inquiry into the state of her finances. The record shows numerous other cash expenditures by Mary Williams. The extensive use of cash in that way suggests fraud. Bradford v. Commissioner, 796 F.2d at 308. 3. Standard of LivingMoreover, it is highly improbable that petitioner Mary Williams actually believed petitioners' joint income to be the figure reported on their joint income tax returns. In Estate of Beck, we observed that: [petitioners] enjoyed a standard of living of far greater magnitude than would have been possible had they received only the net income actually reported by them in their returns filed for the years involved. We find it inconceivable that the Becks were unaware of the discrepancy between their actual and their reported income under such circumstances.Estate of Beck v. Commissioner, 56 T.C. at 368. In the present case, Mary Williams' August 1984 balance sheet showed substantial assets as demonstrated by the chart below. AssetsValuecash$   4,900automobiles (fmv)34,000residence (1/2 interest)50,000household furnishings (1/2 interest)15,000investment500individual retirement account (IRA)4,300cash surrender value of life insurance8,208jewelry (fmv)33,165furs (fmv)10,000total160,073Liabilities and Owner's Equitynotes payable17,000owner's equity143,073total$ 160,073*232 Net earnings reported per petitioners' joint returns for the years 1981 through 1983 are $ 3,615.41, $ 37,730.65, and $ 46,495.53. Moreover, it is apparent that the nature of petitioners' true income was not hidden in bank accounts or otherwise concealed from petitioner Mary Williams. As Mary Williams' own balance sheet demonstrates, she possessed furs, jewelry, and automobiles of great value. It is virtually impossible for Mary Williams to have supposed that such an extraordinarily lavish lifestyle could have been made possible by the comparatively ordinary income reported in petitioners' joint returns. 4. ConclusionIn view of the foregoing, we find that respondent has shown by clear and convincing evidence not only that petitioner Mary Williams understated her income for the years 1981 through 1983, but that she did so with the fraudulent intent to evade taxation. III. The Additions to Tax for Substantial UnderstatementPetitioners have failed to challenge the additions to tax for substantial understatement under section 6661, except insofar as they have disputed the understatements upon which such additions to tax are based. Accordingly, to the extent that we*233 have determined understatements of income tax for the taxable years at issue, we uphold the additions to tax under section 6661, due to petitioners' failure to carry the burden of proof. Decisions will be entered under Rule 155. Footnotes1. For taxable years 1980 and 1981, sec. 6653(b).↩1. For taxable years 1980 and 1981, sec. 6653(b).↩1. Respondent took depreciation into account in decreasing petitioners' net rental income or increasing petitioners' losses. But since depreciation is an expense that does not necessarily evidence any application of funds, respondent has, as a bookkeeping matter, credited such depreciation as a source of funds rather than altering the other figures.↩1. Petitioner Melvin Williams also was indicted for interstate travel in aid of racketeering, 18 U.S.C. sec. 1952(a)(3) and (2), and unlawful use of a communication facility, 21 U.S.C. sec. 843(b) and (2)↩).2. Clark v. Commissioner, 266 F.2d 698, 707 (9th Cir. 1959). See Piper and Jerge, "Shifting the Burden of Proof in the Tax Court", 31 Tax Law. 303, 316↩ (1978): "The Taylor rule applies on any item-by-item basis." Thus, petitioners may, in addition to arguing the pervasive invalidity of the deficiency overall, attempt to demonstrate that the Commissioner has acted arbitrarily with respect to any particular item. Such showing, however, "will shift the burden of going forward to the Commissioner as to that item only. Other items in the determination require independent showings pertaining specifically [thereto]." Piper & Jerge at 316.3. We are mindful that appreciation in value, as opposed to expenditures, may be responsible for some of the jewelry's value reflected in the 1984 balance sheet or the 1985 appraisal. However, petitioners have offered no evidence of what role, if any, appreciation in value may have played.↩4. Respondent's further conclusion that such purchases began in 1982, as opposed to 1980 or 1981 (based upon the known existence of receipts for 1979 through 1981) is reasonable as well. It was also reasonable for respondent to allocate the $ 19,218.80 evenly across the 2-1/2 year period. While such allocations unquestionably rely on educated guesswork, an educated guess is very different from an arbitrary one. It is also significant that it is petitioners who -- through their failure to provide documentation for their purchases -- have put respondent to the guess.↩5. Here, too, we are mindful that some of the value of the furs, reflected in the 1984 balance sheet and the 1985 appraisal, may be due to appreciation in value, as opposed to expenditures. However, petitioners have failed to offer any evidence of what role, if any, appreciation in value may have played.↩6. It is unclear whether the valuation appearing on the balance sheet is based upon fair market value or some other criteria. In the absence of any information to the contrary, it is reasonable for respondent to treat that figure as the fair market value of the residence.↩7. By way of their opening brief, petitioners offer the affidavit of Webster Jackson, stating that he purchased this furniture for Melvin Williams to satisfy a gambling debt in the amount of $ 10,000. That statement is hearsay not in evidence and will not be considered by the Court.↩8. While the exchange account will be described more completely later herein, it is sufficient at this point to observe that petitioners would place funds in the exchange account, where such funds would remain until either petitioners purchased an automobile from the Auto Mart, or else the Auto Mart made some payment to a third party on behalf of petitioners, at which time an appropriate deduction would be made.↩9. There is also some dispute as to whether the consulting fee paid by Scrapp was $ 83,000, or some lesser amount. However, petitioners have offered no evidence to support their position and, consequently, fail to carry their burden of proof in that respect.↩10. More accurately, the schedule shows $2,553.96 in total payments for 1980. However, since respondent concedes that a $ 1,597.49 payment was made by the Auto Mart, petitioners are only responsible for the remaining $ 956.47 in expenditures. ↩11. More accurately, the history card shows $ 2,049.60 in payments. However since it appears that a $ 341.60 payment was made by J.Q.E., Ltd. (a separate company controlled by John Quincey Edwards, owner of the Auto Mart), petitioners are only responsible for $ 1,708 in expenditures.↩12. The calculations attached to the deficiency notice set forth $ 57,592 in applications by petitioners for personal living expenses in 1981. The possibility of a transpositional error notwithstanding, the additional $ 360 would appear to be a new matter, respecting which respondent would bear the burden of proof. Accepting, arguendo, that such burden falls upon respondent, we find respondent to have carried that burden.↩13. By contrast, the addition to tax under sec. 6653(b)(2) applies only to that portion of the underpayment attributable to fraud. Sec. 6653(b)(2). However, to the extent there may be fraud by either petitioner respecting a year at issue in this case, that fraud relates to the entire underpayment for such year. Thus, for any year in which we determine there to be an addition to tax due to fraud, under sec. 6653(b)(1), sec. 6653(b)(2) shall apply to the entire underpayment for such year.↩14. See Patton v. Commissioner, 799 F.2d 166, 171↩ (5th Cir. 1986) (" That Pattons' unreported income was from illegal activities is additional evidence of his tax evasive motive.").15. We use the term "petitioners" here, and at various times throughout this discussion, so as not to imply that petitioner Melvin Williams, alone, was responsible for certain actions. Nonetheless, we are concerned, at this point, only with petitioner Melvin Williams.↩16. We are mindful of the fact that some of the aforementioned transfers were not made by petitioner Melvin Williams, but by petitioner Mary Williams and her father, James Rogers, respectively. While we do not attribute their actions to petitioner, Melvin Williams, we believe that those transfers support the inference that petitioner's transfer of property to Scrapp was part of a pattern of behavior aimed at concealing funds and assets. ↩17. Respondent further contends that Scrapp is petitioners' alter ego, inasmuch as there is a "unity of interest and ownership" between petitioners and Scrapp such that their individual identities have ceased to exist. See Van Dorn Co. v. Future Chemical and Oil Corp., 753 F.2d 565, 569-570 (7th Cir. 1985); Flynt Distributing Co. v. Harvey, 734 F.2d 1389, 1393↩ (9th Cir. 1984). While respondent has offered substantial evidence in support of that conclusion, it is unnecessary to reach the issue. The conclusion that petitioners were using Scrapp to conceal assets is sufficient for our purpose.18. As noted earlier, petitioners placed funds in an "exchange account" where such funds remained until either petitioners purchased an automobile from the Auto Mart, or else the Auto Mart made some payment to a third party on behalf of petitioners, at which point the appropriate deduction would be made. ↩19. The record is replete with evidence of payments made through the Auto Mart and J.Q.E., Ltd., (which, as noted, is another company controlled by John Quincey Edwards, the owner of the Auto Mart), for no apparent legitimate reason. For example, in 1981, petitioners made seven cash payments of $ 341.60 to J.Q.E. Ltd., which payments were recorded in the cash journal of J.Q.E. Ltd. The Auto Mart subsequently made payments in such amounts to Forest Hill State Bank as monthly payments on Mary Williams' loan number 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-004487. Also in 1981 (but by no means completing the list of such occurrences in that year), the Auto Mart paid $ 890 to the Overhead Door Co. on behalf of Melvin Williams, for a door installed at petitioners' residence. Accordingly, that amount was deducted from petitioners' exchange account.↩20. The circumstances surrounding petitioners' purchase of a 1984 BMW for $ 34,692 from another automobile dealer, Tischer Auto, are equally suspicious. First, the Auto Mart acted as an intermediary, receiving payments from petitioners and making payments to Tischer Auto, for no apparent legitimate reason. Second, petitioners, acting with the assistance of the Auto Mart, apparently caused a lien to be filed with the Maryland Department of Motor Vehicles in favor of Forest Hill State Bank, in the amount of $ 19,856.70. That lien was fictitious. Forest Hill State Bank did not loan that amount to Mary Williams. In fact, the record demonstrates that petitioners did not need to borrow such sum to finance their purchase. Between June 25, 1984 and July 10, 1984, petitioners made payments to the Auto Mart, toward the purchase price of the BMW, totaling at least $ 27,692. Thus, petitioners could have owed, at most, $ 7,000 on the BMW at that time. Forest Hill State Bank filed a release of lien on September 14, 1984, to remove the fictitious lien.↩21. Note that the percentage of discrepancy refers to the percentage of reported net income that is unreported. Thus, if reported net income were 1x and total net income were 3x, the discrepancy would be 200 percent. In other words, the understatement of income (2x), divided by the reported net income (1x) is the percentage of discrepancy (200 percent).↩